Spencer S. GREENWOOD, John H. Greenwood, Henry B. Greenwood, Lucille L. Maddox and John F. Greenwood, Plaintiffs,

v.

Benjamin GREENWOOD, William Davis and Fidelity-Philadelphia Trust Co., Defendants.

Civ. A. No. 12930.

United States District Court
E. D. Pennsylvania.

Nov. 2, 1956.

George E. Beechwood, Beechwood & Lovitt, Philadelphia, Pa., for plaintiffs.

Albert C. Brand, J. Arthur Ewing, M. H. Goldstein, Bernard L. Barkan, Philadelphia, Pa., for defendants.

CLARY, District Judge.

This case is again before the Court on plaintiffs' motion to set aside answers to interrogatories found by an advisory jury which, under the decision of the Court of Appeals for the Third Circuit, 1956, 234 F.2d 276, 278, may now be treated as a motion under Rule 52(b) of the Federal Rules of Civil Procedure, 28 U.S.C. to amend the findings of the trial court. The facts of the case are set out in extenso in the opinion of the Court, reported at, D.C.E.D.Pa.1954, 16 F.R.D. 366, and, therefore, need not be recited at length herein. As indicated in that opinion, although the Court had previously adopted the findings of the advisory jury and entered judgment for the defendants, mature consideration of the entire proceedings convinced the Court that the findings of the jury were clearly erroneous. Because of the doubt as to its power to treat plaintiffs' motion as properly taken under Rule 52(b), coupled with the untimely filing of a motion for a new trial, the Court refused to pass upon plaintiffs' motion. That doubt having been resolved in plaintiffs' favor by the opinion of the Court of Appeals, supra, the Trial Judge will now pass on the merits of the motion as one to amend the findings, make additional findings and enter judgment in accordance therewith.

Multiple legal considerations are involved in a just determination of the issues raised by the pleadings and proof in this case. They include a determination of the following questions: (1) Was the evidence elicited by plaintiffs from defendants Benjamin Greenwood and William Davis as on cross-examination competent under the provisions of the Pennsylvania "deadman rule" set out in the Act of May 23, 1887, P.L. 158, § 5, cl. (e), 28 P.S. § 322? (2) Was the Deed of Trust an inter vivos disposition of decedent's property? (3) Did defendants Benjamin Greenwood and William Davis stand in a confidential relation to decedent Emma E. Vanatta? (4) If a confidential relation was shown to exist, did Greenwood and Davis prove by clear and satisfactory evidence that the contract was the free, voluntary and independent act of Emma E. Vanatta, entered into with an understanding and knowledge of its nature, terms and consequences, and further that the entire transaction was

unaffected by undue influence, or imposition, or deception, or fraud? The answers to the above posed questions will of necessity determine the result.

Considering first the question as to the competency of defendants Greenwood and Davis, it appears to the Court that both defendants are clearly competent as witnesses under Section 7 of the Act of May 23, 1887, P.L. 158, as amended by the Act of March 30, 1911, P.L. 35, § 1, 28 P.S. § 381. Defendants have conceded that in this action they are representing the interests of the deceased. The exception to the "deadman rule" provided by Section 7 is, in the opinion of the Court, clearly applicable to the instant situation and the Court considers it did not commit error when it permitted the plaintiffs to cross-examine the defendants. See Billow v. Billow, 1948, 360 Pa. 343, 61 A.2d 817; Sturgeon v. Stevens, 1898, 186 Pa. 350, 40 A. 488. The testimony of these two witnesses as elicited under cross-examination was well within the rules of evidence applicable to witnesses under cross-examination, and the Court, therefore, will consider their testimony in its determination of the issues here involved in the light of all the circumstances of the case.

The second question involves the determination as to whether the deed of trust constitutes an inter vivos disposition of the settlor's property. A consideration of the entire record demonstrates clearly that the transaction involved an immediate and irrevocable disposition of settlor's entire estate by the very terms of the instrument itself. Emma E. Vanatta executed the deed of trust on February 5, 1949. Some time in the early part of 1951, because of further decline in the state of her health and inability to take care of herself, she was placed in a nursing home. She died there on October 2, 1951. On the day she executed the deed of trust, however, to wit: February 5, 1949, she divested herself of all title to all her real and personal property, with one minor exception not important to a decision in the case. While it is argued by defendants that the instrument was in the nature of a testamentary disposition of the property, the document itself lacks the essential characteristics of an ordinary will. Normally a will is of no effect until the death of the maker and is revocable at the instance of the maker so long as he or she may live. Nor does this case in any sense involve the unusual situation where for a valid consideration during his lifetime a testator may contract to make a will in favor of a certain person or persons. That there was reserved to the trustee the right to consume principal for the benefit of an elderly, weak-minded, feeble person does not take this instrument out of the scope of an inter vivos disposition. Particularly is this so when it is realized, as will be discussed more fully under the next heading, that the two principal beneficiaries, Greenwood and Davis, brother and nephew, the proponents of the document in question, had veto power over any untoward dissipation of the principal. Therefore, the law applicable to this case involves that of inter vivos disposition of the property rather than disposition by will. McCown v. Fraser, 1937, 327 Pa. 561, 566, 192 A. 674; Gongaware v. Donehoo, 1917, 255 Pa. 502, 508, 100 A. 264.

The third and most important issue to be decided is the relationship which actually existed between Greenwood and Davis on the one side and Emma E. Vanatta, settlor, on the other. Was there a confidential relation? A thorough review of the facts of the relationship is therefore necessary at this time to determine its true status. Emma E. Vanatta was a childless widow in her seventies who, after the death of her husband in 1939, lived alone for some ten years prior to the execution of the deed of trust in question and in their former home in North Philadelphia. The record is clear that the only two relatives who maintained constant and normal family relationships with Mrs. Vanatta were Greenwood, the brother, and Davis, the nephew. Both were regular visitors; Davis at least weekly and Greenwood once or twice a month. In 1944 the settlor executed a

will, apparently drawn by some one other than a lawyer, leaving all her property to William Davis. Whether it met the test of validity in Pennsylvania will never be known since the will was destroyed at the time the present deed was executed on February 5, 1949. By 1948, and at a time when her physical infirmities were such that she could seldom, if ever, leave her home, her two bank accounts, containing the majority of her estate and totalling some $40,000, were transferred by her to herself and Davis jointly under a standard banking contract which included the right of survivorship. The record is not clear whether the action resulted from her own independent suggestion or whether the suggestion emanated from Davis. However, the Court does not deem that fact to be controlling in the light of the subsequent actions of the two principal defendants.

Greenwood, the brother, for many months knew nothing of the creation of the joint accounts. Some time around the middle of November, 1948, he was informed by one of the few persons friendly to Mrs. Vanatta that she had placed her bank accounts in the joint names of herself and Davis. A few days later, while visiting at her home, he saw a bank statement which indicated that at least one of the accounts was in the joint names of Mrs. Vanatta and Davis. The record is extremely vague as to whether or not he communicated his discovery to her at that time. At any event he immediately, or at least shortly thereafter, and without her knowledge, consulted his attorney M. H. Goldstein, Esquire. There could be only two motivations for such action on his part as under the then situation it was Davis who had joint ownership of the bank account. Either Greenwood wanted to get protection for Mrs. Vanatta or he wanted to get something from her for himself. That he originally strongly suspected Davis of "putting something over" on his sister is clear. Greenwood first expressed his own suspicions to Goldstein; Goldstein expressed his own personal suspicions both in conversation with his employee

Bernard L. Barkan, Esquire, as well as in his correspondence with banks seeking information about her bank accounts; Goldstein further arranged for a mental examination of Mrs. Vanatta by two qualified psychiatrists and authorized the preparation of a petition for the appointment of a guardian to take charge of her estate. Although he did not represent Davis, Goldstein summoned him to his office, at which time Davis, to protect such interest as he might have in the estate, consulted and retained Albert C. Brand, Esquire. From that moment Emma E. Vanatta's affairs were manipulated by Greenwood and Davis through their respective lawyers, Goldstein and Brand. When Greenwood charged his sister with transferring her property to Davis (what happened at that meeting is not at all clear from the record), she immediately decided to change the disposition and asked him to get a lawyer. Greenwood's testimony as to all discussions with his sister is very meager and, except for enlightening admissions as to his purpose in retaining Goldstein, affords little help in revealing what actually happened. When, at the instance of Greenwood, the infirm and senile settlor sent for Davis and told about her brother's discovery and that she wanted to change the disposition of her property, she also asked Davis, as she had asked Greenwood, to get her a lawyer. Brand consulted the settlor after she had been examined on December 9, 1948 by the two aforesaid psychiatrists, Dr. B. J. Alpers and Dr. Calvin S. Drayer, both known by the Court to be eminently qualified in that field. The date of Brand's first consultation with the settlor is fixed at December 16, 1948, exactly one week after the aforesaid doctors had found her to be so mentally incompetent as to be likely to become the victim of designing persons. Four facts, crystal clear from the record having an important bearing on the decision of the issues of this case, must be kept in mind. First, Goldstein was personally retained by Greenwood; secondly, Brand was retained by Davis to represent him; and third, Greenwood re-

moved from his sister's home all her bank books which he brought to and exhibited to his attorney for his information. He also removed all of her diamonds from her home and retained custody of them in his own home until the date of the execution of the document in question and at a time when she had agreed to execute the document; finally, Goldstein was paid a substantial fee by Greenwood and Brand was paid by Davis. At no time did Mrs. Vanatta ever pay, or was she ever asked to pay for the services of these two attorneys.

Without the benefit of Brand's testimony we do not know what happened at his first meeting with the settlor, apparently in the absence of Davis. We do know, however, that the lawyer-employee of Goldstein's, Bernard L. Barkan, Esquire, shortly thereafter was in a telephone conversation with Brand to discuss the filing of a petition for the appointment of a guardian for the estate of Mrs. Vanatta as a weak-minded person. Brand demurred to this course of action and said that he was to again see the settlor. It was agreed that Barkan and Brand, in company with their respective clients, should see the settlor on the night of January 3, 1949. By prearrangement Greenwood and Davis and their respective attorneys, Barkan and Brand, met with the settlor at the scheduled time. Brand suggested the creation of an irrevocable deed of trust in which suggestion Barkan enthusiastically joined. There was no apparent agreement as to the terms of the irrevocable deed of trust at that meeting, but a few days later, about January 5, 1949, Greenwood telephoned Barkan and told him how his sister wanted her property distributed. Greenwood's testimony in this regard is vague, evasive and completely unsatisfactory. The only direct testimony in regard to this particular fact comes from Barkan. On January 10, 1949, Barkan and Brand first consulted with the Fidelity-Philadelphia Trust Company to determine whether it would accept a deed of trust. Again on January 17th there was a further discussion of the matter at the offices of the Trust Company and certain standard mimeographed forms of trust agreements were submitted to the respective attorneys as suggested items to be included within the scope of the prospective deed of trust. Barkan thereupon, with the acquiescence of Brand, proceeded to draw the first draft of an agreement. When this was completed it was discussed with Messrs. Morgan and Harker; Mr. Morgan associated with general counsel of the Trust Company and Mr. Harker being a Trust Administrator of that Company. Mr. Morgan suggested certain practical and technical inclusions and exclusions in the terms of the agreement, all of which would lead to better administration of the trust estate, but which had no bearing upon the ultimate result in this case. It is significant, however, that the veto power over expenditures of principal retained by the two principal beneficiaries, Greenwood and Davis, was changed at Mr. Morgan's suggestion so that if there should be a disagreement between the parties the decision of the Trust Company would be final and binding upon all parties. It is further highly significant that there is no testimony in the record from Barkan that this feature was suggested by the settlor. On the contrary, there is sworn testimony in this proceeding by Davis that he and Greenwood determined between them that such a provision should be included in the agreement (R. 62, 63). On Sunday, January 23rd, Barkan alone visited the settlor to get her consent to the changes proposed by the Trust Company. Barkan, Goldstein's employee, who was the directing force in the whole transaction, on the morning of the date set for the execution of the agreement, Saturday, February 5, 1949, went to the home of the settlor, again ostensibly to fully acquaint her with the final details of the proposed deed of trust. That afternoon it was executed by the settlor in the presence of Messrs. Greenwood, Davis, Barkan, Brand, Morgan, Harker, and a notary from the neighborhood, Mrs. Grace I. Thom. Such an assembly of persons, in-

deed, must have presented a most impressive situation to a lady who for years had practically been a recluse and who had had very few and only individual visitors during that time. The testimony indicates that each formal provision of the entire document was read aloud to the settlor and that she acquiesced in each of the provisions. The testimony further indicates that she was concerned only with finding out two (to her) important facts; (1) That the execution of the instrument would still permit her to have a few dollars of her own in cash per month, and (2) that she might be permitted to live out the rapidly dwindling span of her life in what had been for so many years the home of herself and her deceased husband (R. 347, 348, 349). Exceedingly significant to a determination of this issue is the refusal of the Trust Company to accept the deed of trust until a further physical and mental examination was had of the settlor. This further examination in the presence of Barkan was had some nineteen days later by Dr. Alpers, at which time he found the settlor to be calm and in such a mental state that on that day he concluded that she had testamentary capacity. Only after his report did the Trust Company accept the deed of trust.

To gain a comprehensive understanding of the facts surrounding the suggestion of the irrevocable deed of trust and its execution it is necessary to examine the entire record of the case. Certainly on December 9, 1948, the settlor, in the opinion of the Court, lacked even testamentary capacity. Both attorneys knew of her impaired intellect and so did the two principal beneficiaries, Greenwood and Davis. There is no doubt that it was specifically at Greenwood's insistence the settlor changed her prior disposition of her estate. In that status Brand, representing Davis, called to see the settlor regarding the disposition of her considerable estate. Had a petition for a guardian been filed, despite the hearsay testimony in the case of a general practitioner who was treating her for a cold or virus condition that it was that disease rather than deteriorated mentality which caused her confusion, there is no doubt in my mind that on the testimony of Doctors Alpers and Drayer any court of competent jurisdiction would have appointed a guardian of the estate of this weak-minded person. Despite this, Barkan and Brand visited her at her home on the night of January 3, 1949, and persuaded her to create an irrevocable deed of trust. And for what purpose? It could not be stated better than in the sworn testimony of Davis himself at page 61 of the record, as follows:

" * * * Well, that was the idea, when I seen she was going to change —to change her will from what she wanted to do, I thought it would be—* * * a good way to make it one way she couldn't change it again, so somebody else couldn't get in and influence her, after taking it away from me, influence her to get her talked into or out of something."

That Davis felt Greenwood was taking something away from him is entirely clear from the foregoing quotation. That he wanted to salvage what he could for himself from the estate of a person of deteriorating mentality is likewise clear. The inescapable conclusion follows that a deal was made between the two respective attorneys representing their clients, Greenwood and Davis, to put the settlor's property forever beyond her reach so that she could not become the victim of *other* designing persons.

■■ Was there a confidential relation? This is a mixed question of fact and law. From all of the evidence in this case the Court finds that a confidential relation existed between Greenwood and Davis on the one side and Emma E. Vanatta, the settlor, on the other. The record is replete with, of course, minor instances wherein over the years in any matters, other than the purchase of groceries, the settlor discussed with Davis and/or Greenwood, or the Trust Company, when she was able to visit its offices, any matters of importance to her. Davis admitted that whenever she wanted to know anything she would send for

him and he would go down to her home and she would discuss it with him. Among others, the discussions included the provisions of Mrs. Vanatta's will and advice concerning the sale of her real property. With her brother she had discussed various matters of importance to her including the settlement of her husband's estate. There can be no doubt from the evidence that the settlor was a person of diminishing mentality and that Greenwood and Davis were the persons in whom she would naturally confide and implicitly trust.

■ What constitutes a confidential relation must be determined from all of the surrounding facts and circumstances of any particular case. Stewart v. Hooks, 1953, 372 Pa. 542, 94 A.2d 756; Kees v. Green, 1950, 365 Pa. 368, 75 A.2d 602.

There are set out in the Stewart v. Hooks decision, supra, by Mr. Justice Allen M. Stearne, three separate and distinct generalizations of confidential relation; 3 Bogert on Trusts and Trustees (1946), Section 482, p. 82; 65 C.J., Trusts, Section 228; 89 C.J.S., Trusts, § 151; 4 Pomeroy's Equity Jurisprudence 138.

3 Bogert on Trusts and Trustees (1946), Section 482, p. 82:

"Equity will never bind itself by any hard and fast definition of the phrase 'confidential relation'. It will not list all the necessary elements of such a position. It desires to reserve liberty to apply the doctrine whenever it believes that a suitable occasion has arisen * * *

"In declaring a relation technically 'confidential', the courts lay stress on various factors. There is always, of course, the actual placing of trust and confidence on at least one occasion, and often such reliance has been exhibited through a series of months or years. In some cases this imposition of confidence seems to be the sole foundation for the finding of a confidential relation. But generally there is great disparity of po-

sition, in addition to the actual instrument. The party who claims to be a cestui of the confidential relation is in a weak position because of advanced age, or youth, or lack of education, or ill health, or mental weakness. Frequently also the parties are related by blood or marriage in a close degree so that the imposition of great trust and the letting down of all guards and bars. is natural."

65 C.J., Trusts, Section 228:

"In general, a confidential relation, or fiduciary relation, the two terms being ordinarily used interchangeably, within the meaning of the rule that a constructive trust arises from the abuse or violation of such a relation, exists wherever confidence is reposed on one side and there is a resulting superiority and influence on the other. It has been said that there is no invariable rule which determines the existence of a confidential relationship, but that ordinarily there must be not only confidence of the one in the other, but also on the part of the former some inequality, dependence, weakness, want of knowledge, or other conditions giving to the latter some advantage over the former." See, also, 89 C.J.S., Trusts, § 151.

4 Pomeroy's Equity Jurisprudence 138:

"Thus constructive trusts have been imposed where the relation between the parties was that of principal and agent, attorney and client, husband and wife, parent and child, grandparent and grandchild, and the like in respect of transactions where the promisor was the dominant party * * * A fiduciary relation exists where there is a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interest of the one reposing the confidence; it exists where confidence is reposed on the one side and

the resulting superiority and influence are found on the other side."

From what has been said before, it would seem that every element given by the textbook writers to demonstrate a confidential relation exists in this case. We have here an obvious imposition of confidence by the settlor in her brother and nephew. She was of advanced age, crippled, and of decided mental weakness. The parties involved were related by blood in so close a degree that the imposition of great trust and the letting down of all guards and bars was a natural consequence. We must not lose sight of the fact that this woman of advanced age was virtually a recluse seeing few people and then only briefly. It appears to the Court, therefore, that under such circumstances the conclusion is inescapable that the relation between these two defendants and the settlor was strictly a confidential one.

█ That a very definite attempt was made to surround the execution of this document with all possible legalistic trappings to insure the protection of the interests of Greenwood and Davis is clear from the record. That the mental condition of the settlor is open to question on the date of the execution of the document, February 5, 1949, is also apparent from the record. Dr. Alpers flatly and unequivocally refused to state in his testimony that from his examination of the settlor on February 24, 1949, he could determine that she was mentally competent on February 5, 1949. Both he and Dr. Drayer on December 9, 1948 had determined that she was in an advanced stage of senility and that she was on that date incapable of handling her affairs or making responsible judgments and was likely to become the victim of designing persons. The general rule of law applicable to such a situation is that a condition or state of facts once proved is presumed to continue to exist until proof to the contrary is introduced; Kortz v. Guardian Life Insurance Co., 1944, 10 Cir., 144 F.2d 676; Hertz v. Record Publishing Co., 1955, 3 Cir., 219 F.2d 397; 9 Wigmore on Evidence (3rd ed. 1940)

Sec. 2530. Dr. Alpers did, however, on the basis of a hypothetical question containing certain factual elements which counsel for the defendants said he would substantiate (they were actually never substantiated), gave his opinion that on February 5, 1949 the settlor was competent mentally. Implicit in the facts submitted to the doctor for his consideration was the very important fact that the settlor asked intelligent questions regarding several features of the document presented to her for signature. The only two features of the trust agreement, disclosed by the record, which gave the settlor any concern were (1) her desire to have for her own independent use the proceeds of a small insurance annuity so that she could have some cash of her own and (2) that she should be able to live in her own home, which by the terms of the instrument was being transferred to the Trust Company, for the few remaining years of her life. While defendants argue that these two questions show intelligent appreciation of the terms of the document, an equally persuasive inference which can be drawn is that it demonstrated an apprehensive and terrified old lady pleading for some little security in her own right. The fact that, by joint action, the two principal beneficiaries could, by their joint veto power, refuse approval of expenditures which the Trust Company officials might think not only proper but vital never reached the realm of discussion. The testimony of Dr. Alpers, therefore, offered to rebut the presumption of incompetence, has not convinced the Court that on February 5, 1949 Mrs. Vanatta was of such alert mentality that she could in her own right protect her own individual interests. This opinion is bolstered by the absolute refusal of the Trust Company, there present by two keen experienced observers, to accept the deed of trust until later. If the settlor were as mentally competent as defendants would have us believe, what necessity prompted the insistence of the Trust Company for a further examination? One answer is that on that date the Trust Company representative doubt-

ed her capacity. It is further significant that no attempt was made to obtain the execution of a new deed of trust or at least an affirmance by the settlor of the previous deed.

■ This brings us to a consideration of the final question. Once a confidential relation has been established in an inter vivos disposition of property, it follows that the proponents of the document are faced with the necessity of affirmatively establishing, as set forth in the case of Leedom v. Palmer, 1922, 274 Pa. 22, at page 25, 117 A. 410: *that no deception was used and the act was the intelligent and understood act of the grantor, fair, conscientious and beyond the reach of suspicion.* Otherwise, the law presumes the transaction void. The opinion of Mr. Justice Kephart in the Leedom case, in a succinct statement of law, clearly demonstrates that this has been the law of Pennsylvania since before In re Greenfield's Estate, 1851, 14 Pa. 489, 505. Mr. Justice Allen M. Stearne in his opinion in Stewart v. Hooks, supra, restates the Pennsylvania law in almost precisely the same terms.

■ It follows, therefore, from what has been said before, that the defendants in this case have failed to sustain the burden imposed upon them of establishing by a preponderance of the evidence that the deed of trust was the intelligent and understood act of the grantor and beyond the reach of suspicion. That the attorney for one of the principal beneficiaries urgently insists his utmost concern was the welfare of the settlor is not at all impressive in the light of actual events. While the result reached by these two attorneys in view of the relationship existing between Greenwood and Davis on the one side and the settlor on the other might appear on its face to be a normal disposition of the settlor's property, that fact can bear no weight in the light of the circumstances under which that result was reached. Greenwood's and Davis' interests alone were completely protected. Despite the finding of the advisory jury that Barkan and Brand al-

so represented Mrs. Vanatta as well as their respective clients, as stated previously, it is the opinion of the Court that she not only did not have but should have had her own individual counsel. Both lawyers were retained by and paid by their respective clients and the result obtained indicates that the clients were well represented.

This is a type of case in which the impressions of the Court from hearing the witnesses testify and their manner of testifying is most important in a decision of the issues. Of the two principal beneficiaries, Davis was the more frank. His testimony clearly indicates that it was his intention, through his counsel, to persuade the settlor to place her property forever beyond her reach and further control on her part. Greenwood was less frank. His statements as to his vital associations with his sister during November and December and the part he played in procuring the execution of this document are, as said before, very meager. What he did through his counsel and his counsel's lawyer-employee was to upset the prospective distribution of the settlor's estate, as it had been determined by her several years previously and at a time when there is no evidence that she was of impaired mentality. The fact that relatives in the same degree of blood relation as the two principal beneficiaries, who were not as attentive to the settlor and perhaps not the normal objects of her bounty, might now benefit cannot be of controlling legal significance. The procurement and execution of the deed of trust has not been established by a sufficient burden of proof by its proponents as being the free and intelligent act of the donor. As stated by Mr. Justice Barnes in the case of McCown v. Fraser, 1937, 327 Pa. 561, 565, 192 A. 674, 676:

> "Such a transaction will be condemned, even in the absence of evidence of actual fraud, or of mental incapacity on the part of the donor, unless there is full and satisfactory proof that it was the free and intelligent act of the donor, fully explained

to him, and done with a knowledge of its consequences."

Such proof has not been presented by the defendants in this case. The rule in the Leedom v. Palmer case, supra, must be invoked and the presumption of invalidity follows. In the words of Mr. Justice Barnes such a transaction "will be condemned".

The foregoing may be considered as the Amended Findings of Fact and Conclusions of Law of the Court, as supplemented by the factual statements contained in its previously referred to Opinion, D.C.1954, 16 F.R.D. 366.

An appropriate order granting plaintiffs' motion; vacating the Court's previous adoption of the findings of the advisory jury; setting aside the judgment entered in favor of the defendants, and for judgment in favor of the plaintiffs; declaring null and void the Deed of Trust dated February 5, 1949 between Emma E. Vanatta and the Fidelity-Philadelphia Trust Company, will be entered.