**William CLYDE, III, Appellant,**

v.

**Emma Clyde HODGE and Edwin Hodge, Jr.**

**No. 19350.**

United States Court of Appeals, Third Circuit.

Argued Sept. 28, 1971.

Decided April 24, 1972.

Maynard Garrison, Jr., San Francisco, Cal., for appellant.

John C. Bane, Jr., Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellees.

Before SEITZ, Chief Judge, HASTIE, Circuit Judge, and HERMAN, District Judge.

## OPINION OF THE COURT

HERMAN, District Judge.

### I. FACTS

This case comes on appeal from a directed verdict in favor of the defendants in the United States District Court for the Western District of Pennsylvania.

Plaintiff-appellant William Clyde III alleged mistake, undue influence or fraud on the part of Emma Clyde Hodge and Edwin Hodge, Jr. (the Hodges). Appellant seeks $500,000 in general damages and an additional $500,000 in punitive damages. The alleged undue influence arises out of a trust created by

Margaret Burns Clyde (settlor), appellant's grandmother. The inter vivos trust, created January 31, 1933, excluded appellant from participation in its proceeds. The trust instrument was made irrevocable by the settlor in March 1934. Mrs. Hodge is the settlor's daughter.

Stated as briefly as possible and in a fashion favorable to plaintiff, the facts surrounding the trust are as follows:

The settlor's husband, William Gray Clyde, died March 23, 1931, leaving an estate appellant asserts to have been in the area of $1,000,000 (Mr. Clyde acquired his wealth in part from his position as President of the Carnegie Steel Corporation). Margaret Burns Clyde was named co-executor of the estate with her son-in-law Edwin Hodge. Margaret Clyde renounced in favor of Mr. Hodge, leaving him as the sole executor of Mr. Clyde's estate.

Margaret Burns Clyde, as sole beneficiary, proceeded by all accounts to spend large sums of money. A single New Jersey dress shop bill totaled in excess of $80,000. Plaintiff contends Mrs. Clyde had spent about $300,000 by the end of 1932. (By the time the trust funds were ultimately distributed their value had nearly returned to the $1,000,000 level, appellant alleges) Between the time of her husband's death and the creation of the trust, Mrs. Clyde moved from Pennsylvania to New Jersey. Prior to the move the settlor was in close, almost daily, contact with her daughter, Emma Clyde Hodge, and her son-in-law. She also frequently saw and vacationed with the Hodges' three children.

During the Christmas holidays of 1932 the settlor traveled to Pittsburgh to visit defendants. Shortly afterwards, on January 2, 1933, Mrs. Clyde signed a will in which, among other things, she disinherited plaintiff. Thereafter, on January 31, she signed the trust indenture at issue. Mrs. Clyde's first visit with the trustee was in Toledo in the company of William Clyde II.[1]

The trust, established with the Toledo Trust Company, included virtually all the assets of Mr. Clyde's estate. The assets were placed in a revocable trust, giving Mrs Clyde a reserved life estate of income and principal (that flow of income to be under trustee supervision). The balance of the res was to be distributed to each of the three Hodge children equally via Mrs. Hodge upon Mrs. Clyde's death. (See Appendix with relevant trust provisions) Most notable is the statement, "At the time of the execution of this Trust Indenture, Donor's son, William J. Clyde, has no children. . . ." (Trust Indenture, Article III(d) (2) ).

In March 1934, Mrs. Clyde, in the presence of a bank officer and without the defendant's presence, made the trust irrevocable.[2] The bank representative testified that Mrs. Clyde made "no comment" when the erroneous statement was read.

In 1936 defendants allegedly engaged lawyers to look into a competency hearing for the settlor in light of a possible remarriage. No marriage or competency hearing then occurred. However, in 1942 Mrs. Clyde married one Mr. John Kniley. At that time ex parte competency hearings were instituted and Mrs. Clyde was subsequently ruled incapable of managing her properties. The settlor was then about 73 years old.[3]

In 1947 Mrs. Clyde died. Her trust assets were distributed according to the terms of the indenture.

---

1. William Clyde II expressly disinherited his son, the plaintiff, in his May 23, 1931, will.

2. The irrevocable form of the trust apparently carried a January 1933 date, but did not alter the indenture's substance.

3. Until her death the settlor continued as the wife of Mr. Kniley. His role warrants no further consideration here, but for the purposes of clarity settlor will continue to be called Mrs. Clyde.

## II. LEGAL HISTORY

Because of the unusual nature of this suit, its complex history bears repetition here.

Appellant originally filed suit in district court, naming as defendants the Hodges and their three children. Edwin and Emma Clyde Hodge were not beneficiaries under the portion of the trust here involved. The trustee, Toledo Trust Company, of Toledo, Ohio, was not a party. Mr. Clyde III sought damages from the Hodges, a constructive trust placed on the trust proceeds received by the children of the Hodges and an order determining the rights of the parties under the trust.

Before any decision was rendered by the district court in the present case, an action was brought in an Ohio state court by the Toledo Trust Company as trustee of the inter vivos trust for the purpose of "securing advice and instructions" concerning the administration of the trust. In particular, the trustee sought a determination of whether appellant had any interest in the trust assets. The problem arose because the trust instrument contained a recital that William Johnson Clyde, appellant's father, had no children; whereas, appellant's father did then have a child; namely, appellant.[4] The children of the Hodges, but not the Hodges themselves, as well as the appellant, together with "all other persons known to have interests or claims of interest" in the income or corpus of the trust were named there as defendants.

The children of the Hodges answered the petition and claimed that the distributions were properly made to them pursuant to the provisions of the trust instrument and in accordance with the express intention of the settlor. Appellant also filed an answer to the trustee's petition as well as a cross-petition challenging the trustee's activities in connection with the preparation of the trust instrument and including a charge that the trustee engaged in a fraudulent scheme and conspiracy with the Hodges to deprive appellant of an interest in the trust. By the cross-petition, appellant sought a reformation of the trust instrument to provide him with the interest in the trust he would have received had the settlor been properly informed, instructed, and advised by the trustee.

After final hearing in an unreported opinion, the Ohio court determined, *inter alia,* that the agreement accurately reflected the settlor's intent and that the trust was "valid and subsisting." It gave instructions that payments should be made in accordance with its terms. Appellant's cross-petition was dismissed with prejudice, and no appeal was taken.

Thereafter, the district court granted a motion for summary judgment by appellees. It ruled, *inter alia,* that the judgment in the Ohio action, to which the appellant had been a party, barred the instant suit "under the principles of *res judicata."*

On appeal from that district court ruling, this court (*see,* Clyde v. Hodge, 413 F.2d 48 (3d Cir. 1969)) affirmed in part and reversed in part. This court affirmed the district court in each of its rulings except as regarded the damage suit by appellant against the Hodges. This court found the damage suit against the Hodges not to be *res judicata* as a result of the Ohio ruling. (For the court's reasoning in the reversal, see 413 F.2d, at 50, 51)

On remand the district court took approximately 1,000 pages of testimony before granting the defendants' motion for a directed verdict.

At the close of the defendants' case they renewed their earlier motion for a directed verdict.

The district court granted the motion, saying, " . . . that the evidence is insufficient to establish a confidential relationship between Mrs. Clyde and either of the defendants. Therefore, the plaintiff had the burden of proof by clear, precise, and indubitable evidence

---

4. No children were born to appellant's father after the execution of the trust instrument.

of the alleged fraud and undue influence on the part of the defendants, Mr. and Mrs. Hodge. The court is of the opinion that the evidence fails to meet that standard." (153a Opinion).

## III. EVIDENTIARY BURDEN

The basic legal issue here is whether appellant produced sufficient evidence to create a jury issue as to the existence of a confidential relationship at the critical date. What constitutes sufficient proof of a confidential relationship to shift the burden of proof to defendants?

Appellant's primary authority, Greenwood v. Greenwood, 145 F.Supp. 653, at 658 (D.C.1956) notes correctly that proof of a confidential relationship is a mixed question of fact and law.

Citing briefly from two authorities will establish the legal skeleton of a confidential relationship.

3 Bogert on Trusts and Trustees § 482, at 82 (1946):

"Equity will never bind itself by any hard and fast definition of the phrase 'confidential relation.' It will not list all the necessary elements of such a position. It desires to reserve liberty to apply the doctrine whenever it believes that a suitable occasion has arisen . . .

"In declaring a relation technically 'confidential,' the courts lay stress on various factors. There is always, of course, the actual placing of trust and confidence. . . . But generally there is a great disparity of position, in addition to the actual instrument. . . ."

89 C.J.S. Trusts § 151(b), pp. 1054–1055:

"In general, a confidential relationship, or a fiduciary relationship, the two terms being ordinarily used interchangeably, within the meaning of the rule that a constructive trust arises from the *abuse or violation of such a relationship*, exists wherever confidence is reposed on one side and there is a resulting superiority and influ-ence on the other." (Emphasis supplied).

The relationship must be determined from all the surrounding facts and circumstances relevant to the case. Stewart v. Hooks, 372 Pa. 542, 94 A.2d 756 (1956).

These relevant facts must also be considered in the light most favorable to appellant. Lukon v. Penn R. R. Co., 131 F.2d 327 (3d Cir. 1943); Gold v. Groves, 182 F.2d 767 (3d Cir. 1950). Likewise, the facts must also be presumed true. Makowsky v. Povlick, 262 F.2d 13 (3d Cir. 1959).

Defendant Mrs. Hodge was the settlor's daughter and her husband, a businessman, served as executor of Mr. Clyde's estate. The relationship of blood or marriage is, of course, not presumptive proof of a confidential relation. Clark v. Clark, 174 Pa. 309, 336, 34 A. 610, 619 (1896). Similarly, the renunciation of executorship of an estate in favor of another is also not conclusive. Kerr v. O'Donovan, 389 Pa. 614, 625, 134 A.2d 213 (1957). These are, nevertheless, material facts in establishing such a relation.

The elements of the confidential relationship are thus: (1) a relationship of actual closeness; (2) a substantial disparity in the parties' positions; (3) actual reliance by the settlor on the person in the position of trust.

If appellant's evidence created a jury issue as to the presence of all three in the appropriate manner, the burden will then switch to defendants, to prove the lack of undue influence.

The first element, that of closeness of bond, needs only scant attention here. Assuming appellant's facts to be true, the ties of kinship plus frequent social contact gives rise to a persuasive basis for believing the settlor and defendants to have been sufficiently close.

The remaining two areas present complex problems of fact more than of law. Neither brief is a model of clarity in aiding the court in its quest to deter-

mine whether a jury issue was presented. Appellant's argument rests on a number of allegations that are not clearly established in a chronological sequence. For example, plaintiff relies on Mrs. Clyde's haziness over the details of the trust indenture. To establish that alleged confusion, appellant cites the testimony of an individual who (upon close examination), it turns out, proves only that Mrs. Clyde was confused fully seven years *after* the trust was made irrevocable. Oddly enough, defendants fail to note this error. In fact, none of the allegations by plaintiff regarding the state of the settlor's mind antedated the creation of the trust. True, Mrs. Clyde was totally inept at curbing her spending habits. Nevertheless, such inadequacy goes only to her motivation for creating the trust, and not to substance of the indenture itself. Plaintiff also looks to the 1942 marriage and incompetency hearings. Here, too, we are exposed only to the settlor's state of mind nine years *after* the creation of the trust. That is, plaintiff's evidence, even assumed true, never addresses itself to the central question: What was the state of Mrs. Clyde's mind and her degree of reliance at the time she *created* and later reaffirmed the trust indenture?

Once that threshold question is dealt with, comes the second: What was the role of defendants in the substance of the trust indenture? Nowhere does this court find any legal support for plaintiff's implied contention that mental infirmity, years after creation of an irrevocable trust, is evidence of a settlor's weakness at the creation of the trust. The questions of chronology bring us to plaintiff's Exhibit No. 23 (739a, 740a), the settlor's will of January 2, 1933. Appellant apparently placed the will in evidence to establish a basis of contrast to two later wills. They will be discussed *infra*. The 1933

will is of special interest because of Item 7:

"(2) In the event that Melba V. Clyde survives the said William J. Clyde to pay any balance of said net income to the children of William J. Clyde, *specifically limited to his children born after the date of this Last Will and Testament,* or if there are no such children then to pay said income to the children of my daughter, Emma Clyde Hodge." (Emphasis supplied.)

The admonition excluding appellant is reinforced in the following section of the will:

"(3) Upon the death of the survivor of my said son and his said wife, Melba V. Clyde, to distribute said trust fund in equal shares to his surviving children, *specifically limited to his children born after the date of this Last Will and Testament. . . . ."* (Emphasis supplied.)

The 1933 will is noteworthy for two reasons. First, it specifically excludes appellant from inheritance, and by implication acknowledges that the settlor was aware of his existence. Second, uncontroverted evidence indicates the will to have been prepared with the assistance of three men closely allied with settlor's late husband [5] and without the aid of defendants. Nothing in the record shows the settlor to have been unaware of what she was signing. Presumably, appellant sees the 1933 will as significant in light of a later 1935 will which contains no language of disinheritance. However, the 1935 will significantly covers only property "not already disposed of by deed, trust, gift, assignment, or otherwise." (Plaintiff's Exhibit No. 60, 776a). In effect, the 1935 will is evidence of nothing but settlor's awareness of the 1933 trust document.

An additional piece of plaintiff's evidence warrants consideration at this point. By appellant's own testimony at

---

5. The will was prepared by Messrs. Russell Holcombe, L. H. Burnett, and James W. Hamilton, Carnegie Steel Corporation executives. Hamilton and Burnett were attorneys for the Company.

trial on direct examination (161a, lines 10–25), he concedes that the settlor had knowledge of his existence in the form of letters beginning in 1933 including one dated April 10, 1934. Nothing in the record, no matter how favorably read, explains the repetition in 1934 that William Clyde II had no children, except that she chose to exclude him from her assets.

Through plaintiff's own lips we have before us a settlor who apparently knew of appellant's existence and expressly excluded him from her will just days before she excluded him from a trust. Mindful of the settlor's state of mind just days before the trust creation, we must turn to defendants' role in the trust. Plaintiff refers to the settlor's trip from New Jersey to Pittsburgh during Christmas of 1932. It was then that appellant charges that the settlor decided to establish a trust at the behest of defendants. His sole "evidence" for such an assertion seems to be the closeness in time between the visit and the establishment of the trust. Plaintiff concedes ignorance of the details of the holiday visit. "The origins of that determination have not been revealed to us and Mr. and Mrs. Hodge declined to elucidate at the trial." (Plaintiff's Brief, at 7) In short, plaintiff is without any evidence as to the source of the details of the trust indenture.

Appellant further notes the defendants' role in selecting the trustees. Here, plaintiff says the selection of the Toledo Trust Company as trustee was "agreeable" to Mr. Hodge. Significantly, plaintiff himself adds that Mrs. Clyde was a personal friend of the President of the Toledo Trust Company, a Mr. Thompson. (Plaintiff's Brief, at 7) In this case, proof of any alleged fiduciary relationship must go beyond the mere initiation of a trust to the substance of the trust. That is, appellant must show that defendants had a role in drawing up the details of the trust.

The settlor apparently understood the terms of her independently prepared will of 1933. Likewise, appellant's only evidence concerning settlor's state of mind arises after the trust itself. Most significant is plaintiff's failure to establish a reliance that goes beyond the *creation* of a trust. Mrs. Clyde's first visit with the corporate trustee was in the company of her son (who had similarly disinherited appellant).

Looking beyond the appearances of the relationship between settlor and defendants, appellant cites two facts: (1) Mr. Hodge's close contact with the trustee, and (2) his failure to apprise the trustee of the existence of William Clyde III.

Plaintiff notes that Mr. Hodge asked for and received *copies* of all correspondence between the trustee and settlor. However, the affairs of Mrs. Clyde were handled presumably by herself and the bank. At this stage Mrs. Clyde was living in New Jersey and defendants in Pennsylvania; thus negating the possibility of daily contact. More important, nowhere does appellant prove that Mr. Hodge ever acted in a fiduciary capacity on the correspondence. In any event, the correspondence flowed to Mr. Hodge subsequent to creation of the trust. Mr. Hodge's failure to disclose appellant's existence will be dealt with in greater detail later. Nonetheless, defendant did supply an address for appellant's father, although he was not contacted. (It is worthy of note that William Clyde II categorically disinherited his son from his own will)

Next is Mrs. Clyde's reason for expressly declaring her son to have no children. As noted, *supra*, the Ohio court found this declaration to be a valid disinheritance of appellant. As to the trust itself, the Ohio ruling is *res judicata*. This court is not bound, however, by that ruling as regards any alleged undue influence by defendants.

This court notes three factors which negate the existence of a jury issue as to fiduciary relationship: (1) Mrs. Clyde's 1933 will; (2) the settlor's awareness of appellant; and (3) the relationship between the settlor and appellant's natural mother. The will has

been fully discussed as has the second point regarding Mrs. Clyde's awareness of appellant. The settlor's son and his first wife, Florence McKee, ended their marriage in divorce in 1926. Appellant was the only issue of that marriage. McKee took appellant to California where appellant remained until his first visit with his father and later with the settlor in 1935. Evidence varies as to bitter court battles between Florence McKee and William Clyde II. In any event, the couple was divorced with William Clyde II remarrying (Melba Clyde). The specificity of the will's disinheritance and the precise reference to Melba Clyde (not Florence McKee) as the wife of William Clyde II, indicates the settlor's intentions clearly. Nothing in the record indicates any impropriety regarding the 1933 will. Likewise, it fails to show anything occurring between January 2 and January 31, 1933 to discredit the settlor's second express disinheritance of appellant. •

If the defendants played any role in the decision to create a trust, it falls far short of the degree of control required in 89 C.J.S. Trusts § 76a:

"Where a declaration of trust is procured by undue influence, it is invalid and unenforceable, but the influence exerted must be undue and operative to such a degree as to amount in effect to coercion."

Plaintiff, concededly, relies heavily on Greenwood, *supra*, as authority establishing a test for what constitutes a confidential relation. In Greenwood the plaintiffs sought to set aside an irrevocable trust benefiting defendants. The settlor was well into her seventies and the defendants were in constant contact with her. Less than three months before she signed the document two psychiatrists examined her and declared her to be "so mentally incompetent as to be likely to become the victim of designing persons." (145 F.Supp., at 657) The court significantly declared "that the mental condition of the settlor is open to question on the date of execution of the document . . . is also apparent

from the record" (at 660). Additionally, the settlor was crippled and "virtually a recluse, seeing few people and then only briefly" (at 660).

Although Greenwood could easily be distinguished at this point, more differences appear, the defendants in Greenwood contacted the trustee and informed him what the trust terms would be. Further, the defendants paid all the legal fees surrounding the trust creation. It seems obvious that substantial differences exist between Greenwood and the instant case.

The court now directs its attention to the allegation that Mr. Hodge concealed and/or failed to disclose to the trustee the existence of appellant. It should be recalled here that Mrs. Clyde was accompanied on her first visit with the trustee by her son, William Clyde II (appellant's father).

Appellant contends (although the record does not appear to support appellant) that Mr. Hodge failed to disclose appellant's identity *after* Mrs. Clyde's trip to Toledo. The defendant listed the names and addresses of everyone except appellant. Mr. Hodge gave a Detroit address for William Clyde II. From this, appellant extrapolates willful nondisclosure or fraud. Appellant offers no explanation for the trustee's failure to inquire of William Clyde II if he had any children taking under the trust. A likely explanation is that both William Clyde II and the settlor were aware of the trust and chose not to alter it. In the absence of any corrections by William Clyde II or the settlor, the trustee was not on notice to pursue the matter. Mr. Hodge hardly had an obligation to seek out the whereabouts of William Clyde II (whom no one had yet met). His recital of the address of William Clyde II fails to establish any fraud. Likewise, since the trust had been previously established, his error could not constitute a fiduciary breach of any sort. Appellant further notes a withholding of his name by Mrs. Hodge. (Plaintiff's Brief at 15) Appellant finds it significant that during the 1947 pro-

bating of Mrs. Clyde's estate, Mrs. Hodge failed to list her "brother's children" as requested. Again, the event occurred long after any fiduciary relationship could have existed with the settlor. More important, the trust and wills clearly permit inheritance by only those children of William II born after the creation of the documents. In effect, William Clyde II had no children for the purposes of probating Mrs. Clyde's estate.

## IV.

The record fails completely to create a jury issue as to any confidential relation under the standards cited previously. Such a failure of proof retains on appellant the heavy burden of showing fraud on the part of defendants. This he also failed to do. It is not enough merely to establish a blood-marriage relationship followed by the creation of a corporate-controlled trust. The requisites of a confidential relation in the case at bar demand at least some evidence that defendants had a hand in the indenture's substance. None was forwarded.

As to the question of fraud, appellant's same evidence shrinks in poor comparison. The nature of the burden of proving fraud calls for more than the limply-supported assertions by plaintiff.

The decision of the district court will be affirmed.

## APPENDIX

### ARTICLE III

#### *BENEFICIARIES*

The beneficiaries of this trust shall be the Donor's immediate family, and distribution shall be made as follows:

(a) During the life of the Donor, such part or all of the net income and/or principal of the Trust Property shall be paid to either the Donor, Margaret B. Clyde, or Donor's children, Emma Clyde Hodge, and William J. Clyde, as the Trustee may, in its uncontrolled judgment and discretion, deem proper.

\* \* \* \* \* \*

(c) As soon as practicable after the death of the Donor, the Trustee is directed to convey the following pieces of real estate:

1. To Donor's daughter, Emma Clyde Hodge, the residence at 106 South Marion Ave., Ventnor City, New Jersey, together with all furnishings, fixtures and other household effects therein;

2. To Donor's son, William J. Clyde, the property known as Wil-Mar Cottage, situate at the northeast corner of Pelham and Sunset Avenues, Longport, New Jersey, together with all furnishings, fixtures and other household effects therein;

3. It is Donor's intent to give each of her children an equal distribution, and she therefore directs that the Trustee shall have the two houses above mentioned, together with their furnishings appraised by parties in or near Atlantic City, New Jersey familiar with real estate values and home furnishings, and in the event there is a difference in the valuations of such properties, the one taking hereunder the property of lesser value shall receive in addition to such house and furnishings, a sufficient amount of cash or securities to make up such difference.

4. It is Donor's intent that distribution of the real estate and furnishings be made as expeditiously as possible, and she therefore directs that the real estate be delivered to the two children within six months after the date of her death.

(d) The rest, residue and remainder of the Trust Property including undistributed net income shall be divided into two equal shares and one of said shares shall be distributed as soon as possible to Donor's daughter, Emma Clyde Hodge, or in the event the Donor is predeceased by her said daughter, then said share shall be distributed to the surviving children of Donor's said daughter in equal shares. The remaining share shall

be retained in trust for the following uses and purposes:

1. The Trustee shall pay the net income therefrom in quarter annual installments to Donor's son, William J. Clyde, for and during the term of his natural life, and at his death, provided his wife, Melba V. Clyde, survives, the Trustee shall pay to said Melba V. Clyde the sum of One Hundred Dollars ($100.00) per month, for the balance of her natural life.

2. At the time of the execution of this Trust Indenture, Donor's son, William J. Clyde, has no children, but if any children shall be born to him after the date of the execution of this Trust Agreement, the balance of the net income in this trust shall be paid by the Trustee in equal shares to the surviving children of William J. Clyde, or if there are no such children, then the balance of said income shall be paid in equal shares to the children of Donor's daughter, Emma Clyde Hodge.

3. Upon the death of the survivor of Donor's son and his said wife, the Trustee shall distribute the balance remaining in this trust fund in equal shares to his surviving children born after the date of the execution of this Trust Agreement. If any such children are not of the age of twenty-one (21) years, their respective shares shall continue to be held under the trusts hereof until they respectively attain said age, and provided further that in the event Donor's son, William J. Clyde, shall not leave children or issue of deceased children him surviving entitled to take under the provisions of the next preceding paragraph hereof, then the Trustee shall distribute said trust fund in equal shares to the issue of Donor's daughter, Emma Clyde Hodge, per stirpes.

4. The surviving children of any deceased grandchild of the Donor entitled to distributions hereunder shall take the share of income and/or principal and at the same date as the deceased grandchild would have received such income and/or principal, if living.

(e) Whenever it becomes necessary to make any division of said Trust Property or to pay or deliver any part thereof to any beneficiary hereunder, the Trustee shall fix the value of the various items of Trust Property at any such time or times, and shall make such division in money or property, or both, as in its uncontrolled judgment and discretion shall be fair and reasonable, and such division shall be binding upon all beneficiaries.