**INDUSTRIAL VALLEY BANK AND TRUST COMPANY**

**v.**

**The DILKS AGENCY and First State Insurance Company.**

**Appeal of The DILKS AGENCY.**

**No. 84–1001.**

United States Court of Appeals, Third Circuit.

Argued Nov. 27, 1984.

Decided Jan. 7, 1985.

Richard M. Jordan (argued), Peter J. Mooney, White & Williams, Philadelphia, Pa., for appellant.

Ralph G. Wellington (argued), Irving R. Segal, Sherry A. Swirsky, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellee.

Before HUNTER and WEIS, Circuit Judges, and THOMPSON,* District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This appeal is from an order of the United States District Court for the Eastern District of Pennsylvania entering judgment

in the amount of $387,200.51 for plaintiff-appellee Industrial Valley Bank and Trust Company ("IVB") and against defendant-appellant, The Dilks Agency ("Dilks"), and from an order denying Dilks' motion for additional findings of fact and conclusions of law. Subject matter jurisdiction is based on the complete diversity of the parties, 28 U.S.C. § 1332 (1982), and appellate jurisdiction is under 28 U.S.C. § 1291 (1982). For the reasons stated below, we reverse.

### I.

The underlying facts in this case are largely undisputed, although the parties vigorously contest the conclusions that may be drawn from the facts. In defending and eventually settling a civil action brought against it, IVB incurred approximately $440,000 in losses. *C. Mack Moore v. Industrial Valley Bank and Trust Company,* C.A. No. 80–4909 (E.D.Pa.). The *Moore* litigation arose from a default by Capital First Corporation ("CFC") on a series of debentures for which IVB was indenture trustee. The debenture obligations were secured by CFC lease receivables, in which IVB held a first priority security interest equal to the principal amount of the outstanding debentures. As the aggregate rental receivables due on the leases declined below the principal amount of the outstanding debentures, IVB, as trustee, was obligated to obtain new collateral from CFC. IVB did not obtain new collateral over the period of the debentures, and thus, when CFC defaulted, the debentures, not being backed by sufficient collateral, were virtually worthless. (App. at 1410). The complaint in the *Moore* action alleged that IVB breached its fiduciary duty to the debenture holders by negligently failing to maintain sufficient collateral. (App. at 1410).

The CFC default occurred in November, 1976, and IVB discovered that the collateral protecting the debenture holders was

---

* Honorable Anne E. Thompson, United States District Judge for the District of New Jersey, sitting by designation.

worthless in December, 1976. Three IVB representatives, Frank Martin, Lyman Sener, and Roger Williams, testified either at trial or in depositions that they were aware that the worthlessness of the CFC collateral could lead to litigation against IVB. (App. at 609–616, 683, 1121–23, 1125–27). Both Martin and Sener were employed by IVB's Trust Department, and Williams was IVB's corporate general counsel. Significantly, Sener was also the IVB representative most intimately involved with the maintenance of errors and omissions policies for the trust department.

Dilks was IVB's long-term insurance agent and broker. Prior to May 1, 1979, Dilks provided IVB with an errors and omissions policy for IVB's trust department through Underwriters at Lloyd's ("Lloyd's"). This policy had a liability limit of $100,000, and a $5,000 deductible. (App. at 1458). Although known as a "claims-made" policy, the Lloyd's policy did provide that if during the term of the policy IVB gave Lloyd's written notice of "any occurrence which may subsequently give rise to a claim against [IVB] . . . by reason of any negligent act, error or omission . . .," claims made against IVB after the policy expired and arising from such occurrences would be treated as arising during the term of the policy. (App. at 1456).

Each year prior to the renewal date of the Lloyd's policy, a representative of Dilks contacted IVB Personnel Officer Harry L. Morris and requested certification as to any "known outstanding claims or anything that might cause a claim." (App. at 810). It is undisputed that prior to the institution of this action, no representative of IVB ever informed Dilks or Lloyd's of the circumstances surrounding the CFC default and IVB's possible liability for breach of its fiduciary duty as indenture trustee.

In 1978, because the bank desired to become a self-insurer of smaller losses while continuing to purchase insurance against major losses, IVB requested that Dilks obtain errors and omissions coverage with a higher deductible and a higher liability limit. In response, Dilks submitted estimates for increased coverage from Lloyd's, and an application for a new carrier, First State Insurance Company ("First State"). Dilks informed IVB that the First State policy provided the "same coverage" as Lloyd's, but at lower premiums. (App. at 1557). IVB authorized Dilks to contract with First State, and the policy became effective May 1, 1979.

In fact, however, the First State policy did not technically provide the "same coverage," for by switching carriers, IVB lost continuous coverage for claims made during the term of the First State policy but based on circumstances occurring during the term of the Lloyd's policy.

Based on these facts, IVB alleged in its complaint that Dilks was negligent for not informing IVB of this coverage gap, that the *Moore* claim arising from the CFC default fell into that coverage gap, and thus that Dilks caused the losses incurred by IVB in defending and settling the *Moore* claim.[1] In contrast, Dilks primarily argues that IVB was negligent in not informing Dilks or Lloyd's of the CFC default prior to the switch in insurance coverage, that if IVB had so informed Dilks the Lloyd's policy would have covered the *Moore* claim, and thus that IVB's own negligence bars recovery against Dilks.[2]

The district court held that Dilks breached its duty to IVB by not fully informing IVB of the differences in coverage between the Lloyd's and First State errors and omissions policies, and that this breach caused the losses incurred by IVB in the *Moore* litigation. The court also concluded, with-

---

1. IVB also alleged in the alternative that the First State policy did cover the *Moore* claim, and that First State wrongfully failed to indemnify and defend IVB in the *Moore* action. The district court rejected this claim, and IVB has not appealed from this determination.

2. Because the Pennsylvania Comparative Negligence Act applies only to "actions sought to recover damages for negligence resulting in death or injury to person or property . . .," 42 Pa.Cons.Stat.Ann. § 7102(a) (Purdon's 1982), any negligence on the part of IVB would bar its recovery against Dilks.

out discussion, that IVB was not contributorily negligent in failing to inform Dilks, prior to obtaining the First State policy, of the circumstances surrounding the CFC default. Because we find that IVB was negligent, and that this negligence contributed to IVB's losses, we reverse.[3]

## II.

Although an insurance broker owes a duty of care to its customer, that duty is not unaffected by the conduct of the customer itself. As this court stated sixteen years ago in *Consolidated Sun Ray, Inc. v. Lea,* 401 F.2d 650, 656 (3d Cir.1968), *cert. denied,* 393 U.S. 1050, 89 S.Ct. 688, 21 L.Ed.2d 692 (1969):

> [A]n insurance broker is under a duty to exercise the care that a reasonably prudent businessman in the brokerage field would exercise under similar circumstances and if the broker fails to exercise such care and if such care is the direct cause of loss to his customer, then he is liable for such loss *unless the customer is also guilty of failure to exercise care of a reasonably prudent businessman for the protection of his own property and business which contributes to the happening of such loss.*

(emphasis added).

In our view, the evidence in this case unmistakably points to a failure by IVB to exercise reasonable care in protecting itself against claims arising from the CFC default, despite numerous opportunities to inform Dilks of the circumstances surrounding that default. In December 1976, Frank Martin, head of IVB's Corporate Trust Department, became aware that the collateral supporting the CFC debentures was worthless. (App. at 1689). Martin admitted that at this time he believed that the worthlessness of the collateral could give rise to a claim against the bank, (App. at 1127), and he discussed the problem of the CFC default with Lyman Sener, who was also involved with IVB's trust department. (App. at 603–04, 1125).

In addition, Roger Williams, general corporate counsel for IVB since 1978, testified that from the time he learned of the Capital First default, he was concerned about a possible lawsuit on IVB's trust indenture. (App. at 683). IVB retained outside legal counsel to represent it in matters involving the CFC default shortly after Martin learned of the default, (App. at 1124), and for the specific purpose of "preclud[ing] any suit against the bank by a disgruntled bondholder." (App. at 685, 1813).

Despite the accumulated knowledge of Martin, Sener, Williams, and other IVB representatives, no IVB representative ever informed Dilks of the circumstances surrounding the CFC default, and the possibility that a claim would be made against IVB's errors and omissions policy. IVB argues that until a claim was actually made (*i.e.,* the *Moore* suit), it had no duty to inform Dilks of the CFC default. Although we need not decide whether IVB had a contractual duty to inform Dilks of the CFC default as a condition precedent to insured coverage, we do find that IVB had a duty to use reasonable care in protecting its own business operations.

Indeed, IVB was given numerous opportunities by Dilks to inform either Dilks or Lloyd's of the CFC default, and thus insure coverage for any claims arising from that default. The Lloyd's policy came up for annual renewal from 1964 until the policy ended in 1979. Each year, a representative of Dilks would contact Harry L. Morris, IVB Personnel Officer, and request a certification for the errors and omissions policy renewal that "there were no known outstanding claims or anything that might cause a claim." (App. at 810, 1744). Morris would forward this request to either Martin or Sener, neither of whom at any time between 1976 and 1979 informed Dilks of the CFC default.

---

3. Because we reverse on the contributory negligence issue, we need not address Dilks's alternative grounds for reversal.

This failure to inform Dilks of the CFC default continued even during the time period that IVB and Dilks were arranging to switch insurance carriers. On March 28, 1979, Sener completed an application for errors and omissions coverage with First State. (App. at 1771). Paragraph 24 of that application stated in relevant part: "Is the Bank ... aware of any circumstances which might give rise to a claim against the Bank ...?" Despite his knowledge and Martin's knowledge of the CFC default and the possibility of litigation, Sener again noted in response: "None subject to E & O coverage." (App. at 1771). We find this failure to act on the part of IVB and its representatives to constitute a lack of due care in protecting its own business operations.[4]

This negligence also contributed to IVB's losses suffered in the *Moore* litigation. The Lloyd's policy expired on May 1, 1979, and the First State policy came into effect. Because IVB had not informed Dilks or Lloyd's of the CFC default prior to that date, IVB lost coverage for any claim, including the *Moore* claim, which arose after the expiration of the Lloyd's policy.[5] Further, because Dilks, solely as a result of IVB's negligence, lacked knowledge of the CFC default, Dilks had no reason to suspect that IVB needed additional insurance protection in the First State policy to cover claims arising from the CFC default. Indeed, the record suggests that even if Dilks had known of the CFC default prior to applying for the First State policy, First State would not have covered a known pre-existing condition, and IVB's only coverage

for the *Moore* claim would have been under the Lloyd's policy. (App. at 1087).

### III.

Accordingly, we hold that the IVB representatives did not act with the reasonable care of a prudent business person when they failed to inform Dilks of the CFC default, and the district court's findings to the contrary were clearly erroneous. Because IVB's own negligence contributed to its loss, Dilks cannot be held legally responsible for the losses incurred by IVB in the *Moore* litigation. We will reverse the district court, and order that judgment be awarded in favor of Dilks.

---

**4.** Contrary to appellee's suggestion, the district court's finding that IVB did not act in bad faith or intentionally misrepresent its answers in the First State applications is not inconsistent with a finding that IVB's failure to inform Dilks of the CFC default was negligent. The district court construed the application and IVB's actions in the context of First State's request for rescission of the First State policy because of fraud. Because the standard for rescinding an insurance contract because of fraud is higher than that for contributory negligence, a finding of negligence is entirely possible even where fraud does not exist. *See, e.g., Lotman v. Secur-*

*ity Mutual Life Ins. Co.,* 478 F.2d 868, 870 (3d Cir.1973).

**5.** Paragraph 13(ii) of the Lloyd's policy conditioned coverage for claims arising after expiration of the policy on written notice to Lloyd's during the policy term of "any occurrence which may subsequently give rise to a claim" against IVB. (App. at 1456). If IVB had given notice of the CFC default, in compliance with the annual renewal certification, IVB would have had coverage for the *Moore* claim.