Jeanne M. WEISBLATT, Individually and in her capacity as Executrix of the Estate of Jerry Weisblatt

v.

The MINNESOTA MUTUAL LIFE INSURANCE COMPANY.

Civil Action No. 97–2764.

United States District Court, E.D. Pennsylvania.

April 1, 1998.

Stanley B. Siegel, Huntingdon Valley, PA, for Plaintiff.

Melissa Lang, Philadelphia, PA, for Defendant.

## MEMORANDUM

DALZELL, District Judge.

Plaintiff here sues for recovery of insurance benefits which she admits she neither bought nor specifically requested. Defendant has moved for summary judgment as to all counts in plaintiff's second amended complaint, and for the reasons detailed below, we will grant the motion and enter judgment in favor of defendant.

### I. Background[1]

Donald Scarazzo, an insurance agent of defendant Minnesota Mutual Life Insurance Company (hereinafter "MMLI"), twice met with plaintiff Jeanne M. Weisblatt and her husband, Rabbi Jeffrey Weisblatt, on March 30, 1994 and June 15, 1994. *Opp'n Summ. J.* at 3; N.T. of Jeanne Weisblatt, February 2, 1998 (hereinafter "Weisblatt Dep.") at 84, 92. The first meeting between them lasted two hours. *Id.* at 89. At that meeting, Mr. Scarazzo allegedly represented that "he had many years' experience, that he, specifically, had a diverse knowledge of needs for clergy and that his knowledge was great about insurance, insurance needs." *Id.* at 169. In addition, as Ms. Weisblatt recounts:

[Rabbi Weisblatt] said ... the reason for our meeting was that we needed life insurance; he needed to increase his life insurance. And ... I remember [Rabbi Weisblatt] ... saying, Bottom line is: My wife needs to have enough insurance to not have to work in the event of my death.

And Mr. Scarazzo said, well, you know, the likelihood of that happening wasn't

great because [Rabbi Weisblatt] was young and healthy and that we really need to plan for our future; and, you know, what did that include. And we said, Well, a house, college and everything.

And he said that the likelihood of [Rabbi Weisblatt] dying prematurely wasn't really likely and that—then he went on to show us how as we got older, what [Rabbi Weisblatt] would be ... making as he got older, just in terms of it would grow greater and that Social Security usually covers this much; and there would be a paucity of income there. And that's why we should really buy a policy that would cover us in that event.

And we agreed that there should be some small savings but that our bottom line was ... absolutely that it was life insurance coverage, in the event of his death, that I wouldn't have to work.

And I asked Mr. Scarazzo—because he started asking about, you know, our plans. And that's when I had asked him about, Well, actually, I'd like—I need a financial advisor to help us buy a house and to do all that and, you know, Could he do that. And he said, Yes, absolutely, that he was capable of doing that; and, you know, he could cover all our needs for us.

And then ... he asked what we had. He had seen the Woodmen policy and said that it really wasn't a good policy and did we know that it was going to disappear, that it really wasn't going to be worth anything when [Rabbi Weisblatt] hit 65; which we said, No.

And he said, Well, it really isn't; and let me show you. I have something where I can double your death benefit and not increase your—fee, the amount of your monthly expense to pay for it. And, you

---

1. In evaluating the evidence on a motion for summary judgment, we view the record in the light most favorable to the non-movant and resolve, all doubts as to existence of an issue of material fact against the movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *see, e.g., Gans v. Mundy,* 762 F.2d 338, 340 (3d Cir.), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985). Accordingly, our factual account is

based largely on Jeanne M. Weisblatt's deposition, which we accept as true for the purposes of this motion.

Although plaintiff incorrectly cites *"Anderson v. Creighton,* 483 U.S. 635, 631 [*sic* ] (1987)" for the basic proposition *Anderson v. Liberty Lobby* established, we found no language—or even page—in the *Creighton* case which delivered that promised authority, an error not uncommon in her briefs.

know, why it was a better policy and why we should cash in the other policy and that—Look how much more we were getting for the same money. We believed that, basically, that was all our money could buy.

Weisblatt Dep. at 89–91. Scarazzo thus allegedly recommended that the Weisblatts "surrender" the policy with Modern Woodmen of America (hereinafter "Woodmen Policy"), because it would eventually become "essentially worthless," *id.* at 133, but he did not specify what the cash-in value would be. *Id.* at 135–36. The Weisblatts "never talked about specific amounts [they] needed" for life insurance, *id.* at 105, and Scarazzo never recommended an amount of death benefit he thought the Weisblatts should purchase. *Id.* at 104. He also never mentioned "term insurance." *Id.* at 99.

The second meeting between the Weisblatts and Scarazzo took place a month-and-a-half after the first meeting. *Id.* at 161. At that meeting, the parties retread much the same ground from the first meeting:

[A.] [Rabbi Weisblatt] said to him, again, that our bottom line was life insurance, that we needed the most amount of insurance that we could buy to cover in the case of—in the event of his death; that I wouldn't have to go to work, because I was pregnant with our third child, and I would have to stay home and take of the children.

Q. And during that second meeting, did your late husband raise anything pertaining to life insurance having a small savings element in it?

A. Well, that's what Mr. Scarazzo was describing that the policy was. He was very adamant .. that that was a large concern for us, was the pension—that had to be after retirement,

that we have additional savings for that; and that he had doubled the insurance for the same amount and that this was a good thing. And that was it.

*Id.* at 162–63. At neither meeting did the Weisblatts request—nor did Scarazzo offer—a policy with a death benefit in excess of $200,000. *Id.* at 165.

Rabbi Weisblatt died on June 1, 1995, widowing plaintiff and leaving three small children. *Second Am. Compl.* at ¶ 39. MMLI paid Mrs. Weisblatt a death benefit of the full policy amount of $200,000, plus a proportionate dividend, premium refund, and interest totalling $2,691.62. *Second Am. Compl.* at ¶ 40. After the Rabbi's death, Mrs. Weisblatt "determined that the death benefit of the [MMLI] Policy was insufficient to meet the Weisblatts' 'Expressed Needs,'" *id.* at ¶ 41, *i.e.*, "to provide plaintiff with an income from the interest on the death benefit, without invading the principal of the death benefit, such that plaintiff would not have to work, but instead would be able to raise their three small children full time." *Id.* at ¶ 21. Believing herself to have been hoodwinked by Scarazzo and MMLI, whom she thought had guaranteed that the policy they sold her would meet her "Expressed Needs," plaintiff brought this action, alleging common law negligent misrepresentation and fraud and deceit, statutory bad faith, and violations of Pennsylvania's consumer protection laws.[2]

## II. *Legal Analysis*

### a. *Summary Judgment Standard*

■ Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judg-

---

2. Count four of plaintiff's second amended complaint is actually titled "Unfair Insurance Practice," which appears to suggest that plaintiff is alleging violations of Pennsylvania's Unfair Insurance Practices Act, 40 Pa.Stat.Ann. § 1171.1 *et seq.* In the body of the count, however, plaintiff cites provisions of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, a separate statute, and thus we conclude that the count is merely inaccurately styled.

The parties do not dispute that Pennsylvania law applies, and we do not question that agreement. Our diversity jurisdiction is equally clear, given MMLI's and Mrs. Weisblatt's corporate and individual citizenship (Minnesota and Pennsylvania, respectively), and the policy amount at issue.

ment as a matter of law." Fed.R.Civ.P. 56(c). To defeat summary judgment, the non-moving party "may not rest upon the mere allegations or denials of [her] pleading, but [her] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Specifically, the non-moving party must produce evidence such that a reasonable jury could find for that party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A mere scintilla of evidence, however, will not require us to send the question to the fact-finder. *Id.* at 251, 106 S.Ct. 2505 (citing *Improvement Co. v. Munson,* 81 U.S. 442, 14 Wall. 442, 448, 20 L.Ed. 867 (1872)). When considering how a reasonable juror would rule, we apply the substantive evidentiary standard that the fact-finder would be required to use at trial. *Id.* at 252, 106 S.Ct. 2505.

■ Two different substantive evidentiary standards apply to plaintiff's claims in this case. As to her claims of common law fraud, fraudulent violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (hereinafter "UTPCPL"), 73 Pa.Stat.Ann. § 201–2(4)(xv) and (xvii), and statutory bad faith, 42 Pa.Stat.Ann. § 8371, plaintiff must prove each element of those claims by clear and convincing evidence. *See Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 F.2d 715, 731 (3d Cir.1991) (citing *Scaife Co. v. Rockwell–Standard Corp.,* 446 Pa. 280, 285, 285 A.2d 451, 454 (1971), *cert. denied,* 407 U.S. 920, 92 S.Ct. 2459, 32 L.Ed.2d 806 (1972)) (applying clear and convincing standard to common law fraudulent misrepresentation claims); *Prime Meats, Inc. v. Yochim,* 422 Pa.Super. 460, 468, 619 A.2d 769, 773, *Appeal denied,* 538 Pa. 627, 646 A.2d 1180 (1994) (table) (holding that in order to recover under the prohibition on fraudulent conduct under the UTPCPL, elements of common-law fraud must be proven); *Polselli v. Nationwide Mut. Fire Ins. Co.,* 23 F.3d 747, 750–51 (3d Cir.1994) (applying evidentiary standard to statutory bad faith). As to Mrs.

Weisblatt's claims of negligent misrepresentation and non-fraudulent violations of the UTPCPL, 73 Pa.Stat.Ann. § 201–2(4)(v) and (vii), the evidentiary standard is one of a preponderance of the evidence. *See Fiorentino v. Travelers Ins. Co.,* 448 F.Supp. 1364, 1370 (E.D.Pa.1978) (citing *Rempel v. Nationwide Life Ins.,* 227 Pa.Super. 87, 323 A.2d 193 (1974), *aff'd,* 471 Pa. 404, 370 A.2d 366 (1977)) (applying standard to negligent misrepresentation); *DiLucido v. Terminix,* 450 Pa.Super. 393, 401, 676 A.2d 1237, 1241, *appeal denied,* 546 Pa. 655, 684 A.2d 557 (1996) (table) (applying standard to provisions of UTPCPL).

### b. *Negligent Misrepresentation*

We first address defendant's motion for summary judgment as to count one of the second amended complaint.

■ In order to succeed on a claim of negligent misrepresentation under Pennsylvania law, plaintiff must prove four elements by a preponderance of the evidence: (1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity, or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation. *Gibbs v. Ernst,* 538 Pa. 193, 209, 647 A.2d 882, 890 (1994) (citing W. Page Keaton, *Prosser and Keaton on the Law of Torts* § 105 (5th ed.1984)); *see also Fiorentino,* 448 F.Supp. at 1369 (citing *Avondale Cut Rate, Inc. v. Associated Excess Underwriters, Inc.,* 406 Pa. 493, 178 A.2d 758 (1962) and *Aresto v. National–Ben Franklin Fire Ins. Co.,* 184 Pa.Super. 114, 133 A.2d 304 (1957)).

■ Plaintiff argues that Scarazzo and MMLI were negligent[3] in three ways: (1)

---

**3.** It is axiomatic that

> a principal is liable to third parties for the frauds, deceits, concealments, misrepresentations, torts, negligences and other malfeasances and misfeasances of his agent committed within the scope of his employment even though the principal did not authorize, justify, participate in or know of such conduct or even if he forbade the acts or disapproved of them,

affirmatively misrepresenting that the policy which he sold to the Weisblatts would cover their "Expressed Needs," (2) omitting mention of other insurance options, such as term insurance, that allegedly would have provided the Weisblatts with more coverage-per-dollar, and (3) affirmatively misrepresenting the character of the Weisblatts' then-existing Woodmen policy in order to induce them to cash in that policy.[4] None of the offered grounds, even when accepted as true, is sufficient to survive MMLI's motion for summary judgment.

### i. Affirmative Misrepresentations: MMLI Policy

As to plaintiff's first claim, and construing all evidence in plaintiff's favor, we nonetheless conclude that Mrs. Weisblatt has produced no evidence to support her allegations of affirmative misrepresentation of the MMLI policy.

Plaintiff does not dispute that the literal terms of the policy she purchased from MMLI—*i.e.*, an adjustable life policy with a death benefit of $200,000—were, in fact, precisely as Scarazzo represented and as MMLI subsequently paid, and that the MMLI death benefit was double that of the Woodmen Policy for approximately the same premium amount. *See* Weisblatt Dep. at 104–06. Rather, she insists in her second amended complaint that Scarazzo misrepresented to her that the $200,000 MMLI policy which she bought would cover her "Expressed Needs," *i.e.*, "to provide plaintiff with an income from the interest on the death benefit, without invading the principal of the death benefit, such that plaintiff would not have to work, but instead would be able to raise [her] three

small children full time." *Id.* at ¶ 21, 133 A.2d 304.

Plaintiff admitted in her deposition, however, that Scarazzo made no such statement. *See* Weisblatt Dep. at 174–75. To the contrary, it appears that Scarazzo stayed within the confines of truth in his statements about the MMLI policy, and the Weisblatts inexplicably construed Scarazzo's statements to mean that he was offering the maximum coverage available from MMLI to satisfy their "Expressed Needs", *e.g.*:

> Q. At any time during either of those two meetings, did either yourself or your late husband say to Mr. Scarazzo that you wanted a policy with a death benefit in excess of $200,000, using a specific figure, not saying, We want all the death benefit we can buy?
>
> A. No, he didn't. Our understanding from Mr. Scarazzo was that this was the most that we could buy.
>
> Q. *What, specifically, did Mr. Scarazzo say to you and your late husband in that regard?*
>
> A. *That he ... was pleased that he could double our death benefit without raising the premium.*

Weisblatt Dep. at 165–66 (emphasis added).

 Furthermore, even if we were to find that Scarazzo made affirmative misrepresentations about the MMLI policy, we find that plaintiff did not, in fact, justifiably rely on them in purchasing the policy. Plaintiff admits that, *at the time* she purchased the MMLI policy, and notwithstanding Scarazzo's alleged misrepresentations, she actually

---

as long as they occurred within the agent's scope of employment. *Aiello v. Ed Saxe Real Estate, Inc.*, 508 Pa. 553, 499 A.2d 282, 285 (1985).

**4.** Plaintiff also accuses defendant of "twisting" the Woodmen Policy, *Second Am. Compl.* at ¶ 46(d). "Twisting" is roughly defined as the replacement of one insurance policy for another, although precise definitions vary from state to state. *Compare In re Prudential Ins. Co. Sales Practices Litig.*, 962 F.Supp. 450, 473 (D.N.J. 1997) (discussing twisting as defined under New Jersey law) *with Standard Sec. Life Ins. Co. v. Bedell*, 448 N.Y.S.2d 995 (1982) (same under New York statute) *and Liberty Life Ins. Co. v.*

*Schaffer*, 660 F.Supp. 114, 118 (E.D.Mo.1987), *aff'd in part. rev'd in part on other grounds*, 853 F.2d 591 (8th Cir.1988) (same under Missouri law). Plaintiff provides no citation of Pennsylvania case law or other legal authority to support her contention that the "twisting" complained of here either (1) may serve as a basis for a negligent misrepresentation claim, or (2) is even a separate viable action, and therefore we will dismiss her claims to the extent that they are based on theory of twisting. *Cf. Provident Life and Accident Ins. Co. v. Charles*, No. Civ.A. 90–7584, 1993 WL 121504 at *9–10 (E.D.Pa. Apr.14, 1993), *Aff'd*, 14 F.3d 48 (3d Cir.1993) (table).

knew that the $ 200,000 death benefit would be inadequate to cover her "Expressed Needs." [5] Weisblatt Dep. at 174–75. "When the insured informs the agent of his insurance needs and the agent's conduct permits a reasonable inference that he was highly skilled in this area, the insured's reliance on the agent *to obtain the coverage that he has represented that he will obtain* is justifiable." *Fiorentino,* 448 F.Supp. at 1369 (citing *Avondale,* 406 Pa. 493, 178 A.2d 758, and *Aresto,* 184 Pa.Super. 114, 133 A.2d 304 (emphasis added)). Scarazzo obtained the coverage that he actually represented he would obtain, *i.e.* the $200,000 MMLI policy that the Weisblatts actually paid for, and thus his alleged affirmative misrepresentations regarding the MMLI policy do not support an action for negligent misrepresentation.

5. We note another concern in assessing whether the Weisblatts justifiable relied on Scarazzo's alleged misrepresentations. We question whether the Weisblatts communicated and defined their "Expressed Needs" sufficiently to Scarazzo so that they could justifiably rely on his advice. Though the Weisblatts did provide Scarazzo with some financial information, plaintiff recognizes that the information she provided was insufficient to determine exactly what her "Expressed Needs" were, *Second Am. Compl.* at ¶ 46(f), and the Weisblatts never mentioned the specific dollar amount of their "Expressed Needs." In that respect, we note that plaintiff's position that they "could not have been more specific in their dealings with Scarazzo," *Pl.'s Surreply at 6,* is both logically and factually inconsistent with their initial allegations. In any event, although she seeks to lay the failing of inadequate information also at Scarazzo's feet, his sale of insurance here did not proceed in a vacuum; rather, it depended in large part on the Weisblatts' information, which appeared concededly sparse, *see, e.g.,* Weisblatt Dep. at 163–65, 135–37, and thus may have limited Scarazzo's duties to the Weisblatts. *See infra* at n. 13. We recognize that this concern, however, is at bottom an assessment more appropriate for a fact-finder, and as such plays no part in our consideration of defendant's motion for summary judgment here.

6. Specifically, according to plaintiff's second amended complaint, Scarazzo was negligent, *inter alia,* in

 a) failing to disclose that term insurance was available for purchase separately or as a rider to the Policy;
 b) failing to disclose that term insurance offered more death benefit per premium dollar than the Policy; [and]

### ii. *Omissions Regarding MMLI Policy*

Plaintiff also alleges that Scarazzo negligently misrepresented the Weisblatts' insurance options—thereby shorting their coverage—by omitting discussion of other types of insurance policies than the one the Weisblatts bought.[6] In order to determine whether an insurance agent's omissions may properly form the basis for an action of negligent misrepresentation,[7] we must first examine the nature of the relationship between the agent and the insurance buyer, and the duties owed by the former to the latter.[8]

We have been unable to locate guiding precedent from the Pennsylvania courts on this precise point. Furthermore, it is unclear whether Pennsylvania has adopted Restatement (Second) of Torts § 551, which sets forth specific criteria that must be met

 c) failing to disclose that term insurance, or term riders, more nearly satisfied the Weisblatts' Expressed Needs;
 d) failing to urge Rabbi Weisblatt to retain the Woodmen's Policy;
*Id.* at ¶ 46. In essence, their claim is that Scarazzo did not sell them the maximum possible death benefit coverage per dollar available. *Opp'n Summ. J.* at 8.

7. We think it important to point out that plaintiff's claim is for negligent misrepresentation, not simple negligence. Thus, the duty of care owed to an insurance buyer by an insurance agent on a claim of simple negligence, *i.e.,* "to obtain the coverage that a reasonable and prudent professional insurance agent would have obtained under the circumstances," *Fiorentino,* 448 F.Supp. at 1369–70 (citing *Rempel v. Nationwide Life Ins. Co., Inc.,* 227 Pa.Super. 87, 323 A.2d 193), is not at issue here.

8. We first note that a member of this Court has previously held that omissions are not an actionable basis for negligent misrepresentation, even if material. *See Lazin v. Pavilion Partners,* Civ.A. No. 95–601, 1995 WL 614018 at *7 (E.D.Pa. Oct.11, 1995). In his opinion, our colleague Judge Padova stated:

 I disagree with Plaintiff's assertion that an omission can constitute a negligent misrepresentation.... Under Pennsylvania law, one of the four elements that Plaintiff must establish to make out a claim for negligent misrepresentation is that Defendant actually misrepresented a material fact to him. [*Gibbs,* 647 A.2d at 890]. Non-disclosure of a material fact would give rise to a cause of action for fraudulent non-disclosure, not for negligent misrepresentation.
*Id.* at *7 (citation omitted).

in order to hold a party liable for nondisclosure, whether intentional or negligent. *See Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 611 (3d Cir.1995); *but see Gibbs*, 538 Pa. at 215, 647 A.2d at 892 (citing § 551 with approval); *Slaybaugh v. Newman*, 330 Pa.Super. 216, 224, 479 A.2d 517, 521 (1984) (same); *Quashnock v. Frost*, 299 Pa.Super. 9, 26, 445 A.2d 121, 129 (1982) (Spaeth, J., concurring) (same). In the context of fraudulent misrepresentation, however, the Pennsylvania Supreme Court stated unequivocally that "an omission is actionable ... only where there is an independent duty to disclose the omitted information." *Estate of Evasew*, 526 Pa. 98, 105, 584 A.2d 910, 913 (1990); *see also Smith v. Renaut*, 387 Pa.Super. 299, 564 A.2d 188, 192 (1989) ("while a concealment may constitute fraud, mere silence is not sufficient in the absence of a duty to speak."). Application of this rule to negligent misrepresentation is logically consistent with (i) the treatment of fraudulent and negligent misrepresentation under Pennsylvania law, which frequently distinguishes the two causes only on the basis of scienter;[9] and (ii) the tort's underpinnings in negligence, in that it makes a material omission actionable only when it violates a standard of care, *i.e.*, the tortfeasor's duty to speak. Thus, we predict that under Pennsylvania law, an omission or nondisclosure is only actionable under the theory of negligent misrepresentation if there is a duty to speak.[10]

Plaintiff offers a number of potential sources which she alleges establish a standard of care breached by defendant's omission of certain insurance information. First, plaintiff refers us to "[t]he duty of an insurance company to deal with the insured fairly and in good faith," *Dercoli v. Pennsylvania Nat'l Mut. Ins. Co.*, 520 Pa. 471, 478, 554 A.2d 906, 909 (1989). The duty of good faith and fair-dealing, however, "applies only to the enforcement and performance of [insurance] contracts and not to their formation," and thus plaintiff's claims, which arise from the purchase of an insurance contract, are outside the scope of that duty. *In re Prudential Ins. Co. of America Sales Practices Litig.*, 975 F.Supp. 584, 615 (D.N.J. 1996) (applying Pennsylvania law); *Kilmore v. Erie Ins. Co.*, 407 Pa.Super. 245, 252, 595 A.2d 623, 626 (1991) ("The basic contractual nature of insurance coverage ... requires fair dealing and good faith on the part of the insurer."). Likewise, the existence of a fiduciary duty—the second ground plaintiff offers to establish a standard of care is predicated upon an *existing* contractual relationship between the insurer and the insured. *See Connecticut Indem. Co. v. Markman*, No. Civ. 93–799, 1993 WL 304056 at *5–6 (E.D.Pa. Aug.6, 1993); *In re Prudential*, 975 F.Supp. at 617 (emphasizing that "the *contract* and the duties *it* imposes *can* give rise to a fiduciary relationship under special circumstances") (quoting *Garvey v. National Grange Mut. Ins. Co.*, No. Civ. A. 95–0019, 1995 WL 115416 at *4 (E.D.Pa. Mar.16, 1995) (emphasis in original)). Contrary to plaintiff's unsupported assertions, the mere fact that the Weisblatts shared confidential information with Scarazzo is insufficient to create a fiduciary duty. *See Markman*, 1993 WL 304056 at *6.

The last—and most heavily relied upon—doctrine[11] plaintiff cites in estab-

---

9. Plaintiff appears to concede as much by referring us to a single unified discussion of the element of misrepresentation in her briefs, applicable to both intentional and negligent misrepresentation. *See Opp'n Summ. J.* at 32. The burdens of proof we must consider for each claim are, of course, different. *See supra* at 6.

10. Again, plaintiff concedes the point, stating that "omissions are not themselves actionable unless there is a duty to speak...." *Opp'n Summ. J.* at 37.

11. We also note that though plaintiff properly recognizes that "if this case goes to trial an expert will be needed" in order to establish the standard of care in the insurance industry, *Opp'n*

*Summ.J.* at 44, plaintiff has proffered no such expert here. To the contrary, plaintiff's sole proffered evidence of a standard of care—other than the testimony of various MMLI employees, which were deposed as fact witnesses, and upon which plaintiff does not rely in her opposition to summary judgment—is an MMLI document entitled "Market Conduct that Excels: A Framework of Professional Standards for Minnesota Mutual Agents," *Opp'n Summ.J.* at Ex. K, which she alleges "explicitly and implicitly prohibits the expression of material misstatements or the omission of material facts when dealing with laypersons." *Opp'n Summ.J.* at 33. Assuming for the moment that such a document is relevant to establish a standard of care here, plaintiff

lishing a duty to speak is that of a confidential relationship between MMLI and the Weisblatts. Plaintiff argues that Scarazzo's representations of expertise, his superior knowledge of insurance matters, and the two two-hour meetings he had with the Weisblatts are sufficient to establish a confidential relationship between the parties—or at a minimum to create a jury issue as to the existence of such a relationship—and that Scarazzo violated that relationship by failing to disclose fully the Weisblatts' insurance options.

■ Proof of a confidential relationship is a mixed question of fact and law. *Clyde v. Hodge,* 460 F.2d 532, 535 (3d Cir.1972). In *Clyde,* our Court of Appeals set forth "the legal skeleton of a confidential relationship" that a plaintiff must satisfy in order to survive summary judgment: (1) a relationship of actual closeness; (2) a substantial disparity in the parties' positions; and (3) actual reliance by the settlor on the person in the position of trust. *Id.* (citing and relying upon 3 George T. Bogert, *Trusts and Trustees* § 482, at 82 (1946), and 89 C.J.S. *Trusts* § 151(b), at 1054–55). The relationship must be determined from all the surrounding facts and circumstances relevant to the case, *id.* (citing *Stewart v. Hooks,* 372 Pa. 542, 94 A.2d 756 (1953)), and these relevant facts, of course, must be considered in the light most favorable to the plaintiff. *Id.* Moreover, we note that while our Court of Appeals has set forth the three cited steps, the Pennsylvania Supreme Court has been more hesitant to define the precise perimeter of a confidential relationship:

It is impossible to define precisely what constitutes a confidential relation. It is not restricted to any specific association of persons nor confined to technical cases of

fiduciary relationship but is deemed to exist whenever the relative position of the parties is such that one has power and means to take advantage of or exercise undue influence over the other.

*Id.* 584 A.2d at 912; *see also Estate of Lakatosh,* 441 Pa.Super. 133, 142, 656 A.2d 1378, 1383 (1995); Bogert § 482, at 86 ("Equity will never bind itself by any hard and fast definition of the phrase 'confidential relation.' "). Accordingly, we will liberally construe the elements our Court of Appeals set forth in Clyde in considering whether plaintiff has created a jury issue as to the existence of a confidential relationship.

Accepting all of plaintiff's evidence as true, and construing all factual inferences in her favor, plaintiff nonetheless fails to proffer evidence from which a reasonable jury could find, by a preponderance of the evidence, that a confidential relationship existed between the two parties. What it does show is the quintessential arm's-length relationship, that of seller and buyer.

First, although the Weisblatts shared financial information with Scarazzo, two two-hour meetings for the sole purpose of selling insurance is far from adequate to create a "relationship of actual closeness" between the two parties to inspire confidence that Scarazzo was "bound to act for the benefit of [the Weisblatts'] and (could) take no benefit for himself." *Evasew,* 584 A.2d at 914 (Zappala, J., dissenting); *see also Estate of Buriak,* 342 Pa.Super. 371, 373, 492 A.2d 1166, 1167 (1985). This is particularly true (i) in light of the complete absence of other traditional indicia of a confidential relationship, such as the granting of power-of-attorney, *Lakatosh,* 656 A.2d at 1383, and (ii) in comparison to other situations where the Pennsylvania Supreme Court recognizes that a

provides no pinpoint citation or further discussion of this document, particularly as it relates to MMLI's sales practices; our own careful examination of the six-page document reveals nothing in that regard beyond a mission statement and broad articulation of lofty principles Jerry McGuire would envy. *See, e.g. id.* at ex. K at 2 (stating that "fair play" between agents and clients "embodies such concepts as honesty, prudence, vigilance and independence of judgment"). Thus, that document falls well short of establishing—and is only marginally relevant

to—a standard of care for MMLI's agents. Moreover, the MMLI's Director of Agencies for the area encompassing Pennsylvania testified, and plaintiff does not dispute, that no other MMLI document "represents the expectations of [MMLI] regarding sales practices." N.T. of William W. Owens, III, Feb. 13, 1998, at 17. Thus, even assuming that plaintiff found a legal theory that implied a duty to speak here, plaintiff has not produced "such facts as would be admissible in evidence" to establish that standard before a fact-finder. *See* Fed.R.Civ.P. 56(e).

confidential relationship generally exists, *e.g.* "between trustee and *cestui que* trust, guardian and ward, attorney and client, and principal and agent." *Evasew,* 584 A.2d at 912 (quoting *Leedom v. Palmer,* 274 Pa. 22, 25, 117 A. 410, 412 (1922)).

Second, plaintiff has not established a jury question as to whether there was "a substantial disparity in the parties' positions," *Clyde,* 460 F.2d at 535, such that Scarazzo could exercise overmastering or undue influence over them. *Id.* at 912, 914 (citing *Leedom,* 117 A. at 411). Plaintiff essentially points to Scarazzo's allegedly superior knowledge of, and access to, insurance information in support of the parties' relative disparity in positions. By plaintiff's own testimony, however, Scarazzo did not have a monopoly—or even a measurable advantage—over the types of information to which plaintiff argues that the Weisblatts were denied access. The Weisblatts were both college-educated, *see* Weisblatt Dep. at 10–11; *id.* at 28–31, and had purchased insurance at least twice before, *see* Weisblatt Dep. at 47–48; *id.* at 56–58; *id.* at 62–64; *id.* at 69–71, and thus were not neophytes to the insurance market. Furthermore, information regarding the existence and features of other insurance options could have been obtained from any other insurance agent, or even by a phone call to plaintiff's own brother, as plaintiff eventually discovered. *See* Weisblatt Dep. at 51–52 ("So I called my brother ... and he goes, It's term insurance. You buy it. And you buy a lot and it costs a little bit. . . . And that was the first time I heard about that."). The Weisblatts could also have obtained information regarding the differences between the MMLI and Woodmen policies simply by contacting Modern Woodmen of America. *See*

*Opp'n Summ. J.* at 6. Thus, we conclude that plaintiff has failed to carry her burden on summary judgment as to the existence of a confidential relationship between her and her husband and MMLI through its agent.

▪ Our conclusion that plaintiff has failed to establish a duty to speak, and therefore that MMLI does not face liability for Scarazzo's alleged omission of insurance information, is consistent with the treatment of the relationship between insurer and insured in Pennsylvania. Prior to purchase of insurance and formation of the insurance contract, no special duties attach beyond those found in the "ordinary buyer-seller relationship." *In re Prudential,* 975 F.Supp. at 616; *cf. Consolidated Sun Ray, Inc. v. Lea,* 401 F.2d 650, 656 (3d Cir.1968), *cert. denied,* 393 U.S. 1050, 89 S.Ct. 688, 21 L.Ed.2d 692 (1969) (insurance broker is under duty to exercise the care that a reasonably prudent businessman in the brokerage field would exercise under similar circumstances).

▪ As in every other business, an insurance agent's primary enterprise is to sell insurance, a vocation no adult consumer would confuse with a religious order.[12] Concomitantly, a reasonable buyer of insurance (or any other product) must, at peril of *caveat emptor,* act as a reasonable consumer, *e.g.,* research her needs from multiple sources and price-shop for policies.[13] While a good insurance agent will pay careful attention to the insured's needs in structuring a proposed policy, he does so not out of a special duty to act to the consumer's exclusive benefit, but rather out of a duty to his employer—and to his own self-interest—to sell its products as successfully as possible.

---

12. "[F]or a salesman, there is no rock bottom to the life. He don't put a bolt to a nut, he don't tell you the law or give you medicine. He's a man way out there in the blue, riding on a smile and a shoeshine." Arthur Miller, *Death of a Salesman,* at 138 (Penguin Books ed.1976).

13. In Pennsylvania, this is no less true in insurance than any other business: "Each insured has the right and *obligation* to question his insurer at the time the insurance contract is entered into as to the type of coverage desired and the ramifications arising therefrom." *Kilmore,* 595 A.2d at 626 (emphasis added). Failure by the consumer

to exercise due care in the selection and purchase can affect the scope of the duties owed to her by an insurance broker. *Cf. Industrial Valley Bank and Trust Co. v. Dilks Agency,* 751 F.2d 637, 640 (3d Cir.1985). In that regard, we note without comment that (i) plaintiff and her husband told Scarazzo that they were interested in policies with some savings element, *see* Weisblatt Dep. at 90, and (ii) Scarazzo thereafter focused on policies that provided a savings element, and excluded mention of policies, such as term insurance, that did not.

Furthermore, even after an insurer contracts with the insured—thereby creating a "special relationship" between the parties, *Kilmore,* 595 A.2d at 626–27—an insurer's duties to the insured are not boundless. This is particularly true as it applies to informing the insured of possibilities, permutations, and collateral consequences outside the scope of the policy's terms:

> We find no justification in the law to impose the additional burden on insurers that they anticipate and then counsel their insured on the hypothetical, collateral consequences of the coverage chosen by the insured. The basic contractual nature of insurance coverage ... requires fair dealing and good faith on the part of the insurer, not hand holding and substituted judgment. While we acknowledge insurance is an area in which the contracting parties stand in somewhat special relationship to each other, the relationship is not so unique as to compel this Court to require an insurer to explain every permutation possible from an insured's choice of coverage. Each insured has the right and obligation to question his insurer at the time the insurance contract is entered into as to the type of coverage desired and the ramifications arising therefrom.

*Id., see also Treski v. Kemper Nat'l Ins. Co.,* 449 Pa.Super. 620, 674 A.2d 1106, 1114–15 (1996) (citing *Kilmore* with approval). We think the strong language of the Pennsylvania courts precluding liability for omissions by insurers, even when a special duty exists, *a fortiori* precludes a finding of liability in the pre-contractual setting here.

### iii. *Affirmative Misrepresentations: Woodmen Policy*

Plaintiff last complains, in her claim of negligent misrepresentation, that Scarazzo misrepresented the Woodmen Policy as "essentially worthless" in order to induce the Weisblatts to cash it in and buy the MMLI policy. *Opp'n Summ. J.* at 6.[14] As an affirmative misrepresentation, this statement does not suffer the same fatal infirmity described at length above. Plaintiff's claim on these grounds still fails, however, because she has failed to demonstrate that she relied to her detriment on the alleged misrepresentation.

As earlier stated, in order to state a cause of action for negligent misrepresentation, plaintiff must show, *inter alia,* that she was injured by her justifiable reliance thereon. *Gibbs,* 538 Pa. at 209, 647 A.2d 882. Plaintiff does not dispute that the actual death benefit coverage of her husband doubled, with *de minimus* change in the premium the Weisblatts paid, as a result of terminating the Woodmen policy and buying the MMLI policy. Thus, the Weisblatts' replacement of the Woodmen policy with the MMLI policy, even if Scarazzo's negligent misrepresentations prompted it, did not work to plaintiffs' detriment.

As none of MMLI's complained-of actions satisfy the requirements of a negligent misrepresentation claim, we will enter judgment in favor of defendant on this count.

### c. *Common Law Fraud and Deceit*

Count two of the second amended complaint alleges fraud and deceit by MMLI. "Fraud is a legal term symbolizing a coat of many shades and coloring," *Evasew,* 584 A.2d at 911, and whose definition has expanded to include " 'anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, work of mouth, or look or gesture.' " *In re McClellan's Estate,* 365 Pa. 401, 407, 75 A.2d 595, 598 (1950) (quoting *In re Reichert's Estate,* 356 Pa. 269, 274, 51 A.2d 615, 617 (1947)). The scope of conduct encompassed by fraud is not, however, unbounded, and the requirements under Pennsylvania law in order to tailor such an action are well-established: [15]

---

**14.** Plaintiff also claims that Scarazzo may be held liable under negligent misrepresentation because he allegedly did not inform the Weisblatts that they faced substantial penalties for cashing in the Woodmen policy. As an omission which violated no duty to speak, however, that claim fails as a matter of law for the reasons set forth *supra,* part II.b.ii.

**15.** In that regard, we must balance competing interests, being "quick to look for fraud, but not

In order to prove a claim of fraudulent misrepresentation under Pennsylvania law ... the plaintiffs [must] prove: (1) a misrepresentation; (2) a fraudulent utterance; (3) an intention by the maker that the recipient will be induced to act; (4) justifiable reliance on the misrepresentation; and (5) damage to the recipient as a proximate result.

*Tunis Bros.*, 952 F.2d at 731 (citing *Scaife*, 446 Pa. at 285, 285 A.2d 451). Thus, "the initial inquiry for the judge is whether the proof of every element of fraud has met the exacting standard, justifying refusal to grant a non-suit and its submission to the fact-finder." *Delahanty v. First Pa. Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243, 1253 (1983). In that regard, plaintiff bears a heavy burden in establishing each element of fraud by clear and convincing evidence:

What is meant by the statement that the evidence must be clear, precise and indubitable? It means that the witnesses must be "credible, ... distinctly remember the facts to which they testify, and narrate the details exactly", that the evidence "is not only found to be credible, but of such weight and directness as to make out the facts alleged beyond a reasonable doubt"; that "the witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty and convincing as to enable the jury to come to a clear conviction without hesitancy, of the truth of the precise facts in issue."

*Gerfin v. Colonial Smelting & Refining Co.*, 374 Pa. 66, 68, 97 A.2d 71, 72 (1953) (quoting *Stafford v. Reed*, 363 Pa. 405, 407, 410–11, 70 A.2d 345, 346 (1950)).

We need not examine whether Mrs. Weisblatt has established all the elements of fraud, however, because that claim shares with negligent misrepresentation a common required element: there must be a misrepresentation, either an affirmative one or an omission in breach of a duty to speak. Thus, plaintiff's claim of fraud likewise fails for the reasons set forth at length *supra* in part II.b.[16]

▮▮▮ In addition, plaintiff has failed to proffer evidence that would permit a reasonable jury to find, by clear and convincing evidence, that Scarazzo possessed the element of scienter required for fraud.[17] Plaintiff's sole evidence of Scarazzo's intent to defraud the Weisblatts is Scarazzo's testimony regarding his total income in 1994, which plaintiff argues gives rise to an inference that Scarazzo "did not have a good year financially in 1994 ... [and thus] was motivated to improve his financial picture by selling high commission policies." *Pl.'s Surreply* at 8. While we recognize that scienter may be proved by circumstantial evidence, *see Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S.Ct. 683, 692 n. 30, 74 L.Ed.2d 548 (1983), plaintiff has failed to produce sufficient evidence that, if construed in her favor, would create a jury question as to Scarazzo's scienter. At best, plaintiff has allowed the inference that Scarazzo is motivated by the ebb and flow of money, although in that regard he is no different from anyone else in the commercial world.[18] This evidence cannot, however, be favorably construed to show clearly and convincingly that Scarazzo had "either actual knowledge of the truth or falsity of [his] representation[s], [or] reckless ignorance of the falsity of the matter." *Shane v. Hoffmann*, 227 Pa.Super. 176, 324 A.2d 532, 536 (1974). A mere scintilla of evidence as to scienter does require us to send the question to the fact-finder. *See Anderson*, 477 U.S. at 251, 106 S.Ct. 2505. Accordingly,

---

as quick to declare it." *Edelson v. Bernstein*, 382 Pa. 392, 115 A.2d 382, 384 (1955).

**16.** Indeed—and though we do not think it a close question—even were we to find that plaintiff has met her burden of proof on this motion as to the negligent misrepresentation claim, she has fallen well short of demonstrating the viability of her claim by clear and convincing evidence.

**17.** Plaintiff need prove neither knowledge of Scarazzo's alleged fraudulent acts nor intent to deceive by defendant, where the plaintiff can show that the agent who committed the fraud himself acted with intent to deceive and was acting within the scope of his authority as employee of MMLI. *Aiello*, 499 A.2d at 287.

**18.** *See* n. 12, *supra* at pp. 382–383.

plaintiff's claim of fraud fails on these grounds as well.

#### d. UTPCPL Claims

■ Plaintiff also alleged that the actions of MMLI through its agent, Scarazzo, violated the UTPCPL, 73 Pa.Stat.Ann. § 201–2(4)(v), (vii), (xv) and (xvii). Plaintiff's claims as to sections (xv) and (xvii) [19] fail because, as discussed above, she cannot carry her burden on summary judgment as to the elements of common-law fraud. *See Prime Meats,* 619 A.2d at 773.

■ Plaintiff's UTPCPL claims pursuant to sections (v) and (vii) likewise fail for two reasons. First, although she alleges that certain of Scarazzo's alleged omissions violated these sections of the UTPCPL, *Second Am. Compl.* at ¶¶ 70–72, the plain language of those provisions requires an affirmative representation as a predicate for liability. *See* 72 Pa.Stat.Ann. § 201–2(4)(v) (defining unfair or deceptive acts or practices to mean *"representing* that goods or services have . . . characteristics . . . uses [or] benefits that they do not have") (emphasis added); *id.* at § 201–2(4)(vii) (defining same as *"representing* that goods or services are of a particular standard, quality or grade . . . if they are of another") (emphasis added). Plaintiff has cited to no source, such as case law or legislative history, that excuses this requirement. Second, even if such omissions can constitute a proper basis for recovery under the statute, for the reasons discussed *supra,* parts II.b.iii, plaintiff has failed adequately to cite specific facts—as she is required to do, *see*

*DiLucido,* 676 A.2d at 1241—that support her legitimate reliance on Scarazzo's alleged affirmative misrepresentations regarding the characteristics and differences between the Woodmen and MMLI policies.

Accordingly, we will enter judgment in favor of defendant as to plaintiff's UTPCPL claims as well.

#### e. Bad Faith

■ Count three of plaintiff's second amended complaint alleges MMLI's bad faith through Scarazzo's alleged misrepresentations and omissions described above. *Second Am. Compl.* at ¶¶ 58–60. A legal and logical prerequisite for such an action, however, is misfeasance or malfeasance on the part of the insurer. *See, e.g., Terletsky v. Prudential Prop. and Cas. Ins. Co.,* 437 Pa.Super. 108, 125, 649 A.2d 680, 688 (1994) ("[T]o recover under a claim of bad faith, the plaintiff must show that the defendant did not have a reasonable basis for denying benefits under the policy. . . ."). Our findings *supra,* part II.b., that plaintiff has suffered no such adverse action, deprive her of a basis for a bad faith claim here.[20]

An appropriate Order follows.

### ORDER

AND NOW, this 1st day of April, 1998, upon consideration of defendants' motion for summary judgment, plaintiff's response in opposition thereto, defendant's reply to plaintiff's response, and plaintiff's surreply, and

---

**19.** Section (xv) provides that it is an "unfair or deceptive act[ ] or practice" to "[k]nowingly misrepresent[ ] that services, replacements or repairs are needed if they are not needed", 73 Pa.Stat.Ann. § 201–2(4)(xv).

Section (xvii) makes it an "unfair or deceptive act[ ] or practice" to "[e]ngag[e] in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding." *Id.* at (xvii).

**20.** Although further detailed inquiry along these lines is unnecessary, we note that even if plaintiff's claims of fraud or negligent misrepresentation had been supported by evidence sufficient to withstand this motion for summary judgment, her claim for bad faith still would not survive. Pennsylvania has codified the law of bad faith at 42 Pa.Cons.Stat.Ann. § 8371, which provides that courts may award interest, punitive damages, court costs and attorney fees "[i]n an action *arising under an insurance company,* if the court finds that the insurer has acted in bad faith toward the insured. . . ." *Id.* (emphasis added). The plain language of § 8371 thus offers additional relief for bad faith only in actions "arising under" an insurance policy. *March v. Paradise Mut. Ins. Co.,* 435 Pa.Super. 597, 601, 646 A.2d 1254, 1256 (1994). Plaintiff recognizes that MMLI punctiliously complied with the terms of the insurance contract which the Weisblatts actually purchased. Accordingly, because plaintiff's claims do not "arise under an insurance policy"—but rather address conduct prior to formation of the insurance contract—she may not avail herself of the additional remedies provided in § 8371.

for the reasons stated in the accompanying Memorandum, it is hereby ORDERED that:

1. The motion is GRANTED;

2. JUDGMENT IS ENTERED in favor of defendant Minnesota Mutual Life Insurance Company and against Jeanne M. Weisblatt as to all counts in plaintiff's second amended complaint; and

3. The Clerk shall CLOSE this case statistically.